STATE OF TEXAS *v.* EASTERN TEXAS RAILROAD COMPANY ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

STATE OF TEXAS ET AL. *v.* UNITED STATES, McCHORD ET AL., CONSTITUTING THE INTERSTATE COMMERCE COMMISSION, ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TEXAS.

Nos. 298 and 563. Argued November 15, 16, 1921.—Decided March 13, 1922.

1. Where a statute is susceptible of two constructions, one raising grave and doubtful constitutional questions and the other not, it is the duty of the court to adopt the latter. P. 217.

2. Paragraphs 18–20 of § 1 of the Act to Regulate Commerce, added by § 402 of the Transportation Act of 1920, which regulate the construction and acquisition of new lines of railroad and the extension and abandonment of old lines, are not to be construed as clothing the Interstate Commerce Commission with authority over the discontinuance of the purely intrastate business of a railroad whose situation and ownership are such that interstate and foreign commerce will not be affected by that business. P. 218.

Reversed.

THE first of these cases is an appeal from a decree of the District Court for the Western District of Texas dismissing a suit removed from a court of that State, in which the State of Texas sought to enjoin the above-named railroad company and some of its officers from ceasing to operate its road in intrastate commerce. The other is an appeal from a decree of the District Court for the Eastern District of Texas dismissing the bill in a suit brought by the State and its Attorney General, in that court, against the United States, the members of the Interstate Commerce Commission, the United States Attorney General, and the above-named and two other railroad companies, to annul an order and certificate of the Interstate Commerce Commission purporting to permit the abandonment of the same railroad line upon certain conditions.

*Mr. Tom L. Beauchamp,* with whom *Mr. C. M. Cureton,* Attorney General of the State of Texas, *Mr. Bruce W. Bryant* and *Mr. Walace Hawkins* were on the briefs, for appellants.

Under the authority given by the statute, it may be said that the power of the State to forbid extensions has been superseded. It may with good reason be argued that extensions become necessary to interstate commerce whether agreeable to the State in which they are made or not, and this may be given as a reason for the insertion of paragraph 21, authorizing the Commission to require them. If that same argument applied to abandonments,

paragraph 21 should then have included abandonments, as well as extensions, but it does not.

Congress did not intend by the act to exclude the authority of the State. The full purpose is served and the language of the law has been complied with when the Interstate Commerce Commission gives to the carrier its authority to abandon the operation of its line as an interstate carrier, leaving it then to be dealt with by the State creating the corporation and to which it owes its existence and with which it has a charter contract and obligation.

If the acts of the Commission under paragraphs 18–22 are judicial, the paragraphs are unconstitutional. This is determined by the matter at issue before them and its nature and not the nature of the Commission.

A State may control the physical properties of its private corporations and make rules and regulations therefor in accordance with the terms of their charter contracts, and the laws of the State which enter into and become a part of them, so long as such action does not become a direct burden on interstate commerce or embarrass Congress in the exercise of any power with which it is invested by the Constitution. *Baltimore & Ohio R. R. Co.* v. *Maryland,* 21 Wall. 456, 473; *Northern Securities Co.* v. *United States,* 193 U. S. 347; *Gibbons* v. *Ogden,* 9 Wheat. 1, 206, 208.

When the Federal Government, acting through Congress or its committee or commission, designated the Interstate Commerce Commission, withdraws the patronage of interstate commerce from the Eastern Texas Railroad, it has reached the limit of its authority. *Louisville & Nashville R. R. Co.* v. *Kentucky,* 161 U. S. 677, 702; *Northern Securities Co.* v. *United States, supra; Missouri Pacific Ry. Co.* v. *Kansas,* 216 U. S. 262. Is it conceivable that the State, having a commerce over which it exercises exclusive control, cannot control a corporation engaged in such commerce?

Though the Eastern Texas retains its corporate name, it has lost its corporate identity; though its obligations to the State of Texas have not been fulfilled, it has nevertheless become a part of the system of the St. Louis Southwestern Railway Company and is subject to all of the laws of the State and of the United States governing it as a part of the system of the St. Louis Southwestern Railway Company. *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minneapolis Civic & Commerce Association,* 247 U. S. 490.

The Interstate Commerce Commission has no authority under the statute to grant to a railroad company a certificate of public convenience and necessity authorizing it to abandon a part of its main line track in the absence of a showing that the entire system was losing money. *Puget Sound Traction Co.* v. *Reynolds,* 244 U. S. 574.

*Mr. E. B. Perkins,* with whom *Mr. Daniel Upthegrove* and *Mr. E. J. Mantooth* were on the briefs, for appellee railroad companies.

*Mr. Solicitor General Beck* for the United States, in No. 563. *Mr. Robert P. Reeder* was on the brief.

If the construction advanced by Texas be accepted, this portion of the Transportation Act loses its chief efficacy, because of the unified character of the business of transportation for most practical purposes. If the Interstate Commerce Commission only had power to authorize the carrier to abandon its interstate business and were impotent to give like authority to abandon its intrastate commerce, then in most cases the certificate of authority would not be worth the paper it was written on. For a railroad corporation does not abandon its railway unless the business has ceased to be profitable and, if the business be unprofitable when the railroad has the advantage of revenue from both interstate and intrastate traffic, it

would be even more so if it abandoned only one part of its business. In such event its income would be lessened but its expenses would not be appreciably diminished.

To require the consent of both the Interstate Commerce Commission and the State Railroad Commission would mean the very conflict of authority which the law sought to avoid by explicitly providing that the carrier may act upon the certificate of the Commission.

Having given the State, as it were, its day in court, the act (paragraph 20) provides that the Commission in issuing the certificate " may attach . . . such terms and conditions as in its judgment the public convenience and necessity may require." It was evidently intended that the Commission should take into account the just claims of the State. Indeed, the question of public convenience and necessity is left to the Commission. The act does not say that the certificate may contain such terms and conditions as the interest of the interstate commerce or even of the Federal Government may require; it is the public convenience and necessity that the Commission is to consider.

Then follows the significant statement that the carrier may, without securing approval other than such certificate, comply with the terms and conditions and proceed with the construction, operation, or abandonment covered thereby.

What can this mean except the authority to go ahead with the extension or abandonment without consulting any other authority?

The State may not seriously claim that the Eastern Texas Railroad should continue operations at a loss. *Bullock* v. *Railroad Commission*, 254 U. S. 513; *Brooks-Scanlon Co.* v. *Railroad Commission*, 251 U. S. 396.

If Congress may directly or through appropriate agencies condemn defective or inadequate equipment and facilities of interstate carriers irrespective of the nature of

the traffic, whether interstate or intrastate, *a fortiori,* it may authorize a railroad engaged in interstate transportation, which consists mainly of an accumulation of all or many of these things, to cease operations.

If the commerce power be not broad enough to determine whether an interstate carrier, even though incorporated under the laws of the State, may abandon its business for lack of public patronage as an entirety, and without respect to the division between interstate and intrastate commerce, then it is obvious that our political institutions are not in harmony with the present conditions of human society.

The banks, in loaning their credit and furnishing the necessary means of constructing the railroad, take no account of the legal distinction between interstate and domestic commerce. The contractors, engineers, and builders of the road are also unable to regulate their operations by such distinction. So of organized labor; it deals with a system as a whole.

The very act of transportation again illustrates the indivisibility from a practical standpoint and not as a legal abstraction of this indivisible thing that we call commerce.

If, therefore, this legal distinction which seeks to make a duality of an essential unity does not conform to the nature of these economic forces, then it is obvious that our political institutions are lagging behind the economic forces which they are designed to protect and promote. Fortunately, there is no such rigidity.

This court has always recognized that, as human society became more concentrated and complicated, all powers, federal and state, have a necessary reaction upon each other. With or without political institutions, steam and electricity have woven the commercial intercourse of the country into substantial unity, and this unity is therefore an indivisible unity. Therefore, it was futile for the

political government in solving many practical problems to attempt to make any division. A full century after the Constitution was adopted Congress, yielding not merely to the so-called granger movement but to the widespread desire of citizens of all classes, passed the first interstate commerce law; and from that time to the passage of the Transportation Act, legislation has been a series of advancing steps whereby Congress, in behalf of the whole Nation, seeks to end the abuses of transportation and to regulate the commerce of the Nation. To legislate with reference to interstate commerce without assuming an incidental but necessary control over intrastate commerce, had become impracticable with the progress of human society.

This court has recognized in many cases as a concrete proposition that Congress has full and plenary power to regulate interstate carriers as instrumentalities of commerce and that this power can not be lessened, hampered or obstructed by the consideration that, of necessity, these interstate carriers are likewise engaged in intrastate business, and that intrastate business is necessarily affected. If the duality of interstate and intrastate commerce be longer a fact, then they are as the Siamese twins, two bodies and yet united by a common ligature.

The Government, apart from its power under the commerce clause, owes to these corporate instrumentalities of commerce a direct obligation, due to the fact that they were taken by the Government for public use, and all the obligations that arise under that public use must be met by the power under which they were taken over, the war power.

This power was assumed not merely to carry on the war, but at the present time the Government, because it utilized the railroads to carry on the war, has become a creditor to the extent of many millions of dollars of the corporate instrumentalities which it operated. It has the

power, like any other lien creditor, before it releases the property, to which it must look as security for the amounts due it, to see that that property is not sacrificed by undue regulation.

The Government's claim rises higher than that of a mere creditor. Under the Transportation Act it has guaranteed for a period of six months the standard return to the railroads as measured by prewar experience, and it has further directed the Commission, in order to rehabilitate the railroads, that it shall authorize rates that will enable the railroads to secure for a period of years an adequate return upon their investment. If, during such period of rehabilitation, Congress provides that a railroad should not increase its obligations by extending its lines, or, on the other hand, should not lessen the value of the security by abandoning its road, or should not increase the guaranty of the Government by running the road at a loss, why is not such an exercise of power the exercise of the war power and as such an appropriate means to discharge the important duty of rehabilitating the railroads, which suffered such grievous injury during the period of governmental control?

If Congress has power to provide adequate transportation for interstate commerce and to that end may protect the credit of the carriers by supervising and regulating the issue of their securities and the expenditure of the capital funds, why may it not for the same purpose prevent unwise expenditures for unnecessary extensions and the absorption of their means and the destruction of their credit through the continued operation of unnecessary lines? The power to regulate presupposes the existence of the thing to be regulated and would be void without the power to "foster" and "protect" it. If a State may prevent an abandonment of a line within its borders which is in the opinion of Congress sapping the resources of an instrumentality of commerce, or is reducing its

9544°—23——17

capacity and usefulness, the State may impair or destroy this instrumentality of interstate commerce and thus destroy interstate commerce itself.

*Mr. Walter McFarland,* with whom *Mr. P. J. Farrell* was on the brief, for the Interstate Commerce Commission.

Mr. JUSTICE VAN DEVANTER delivered the opinion of the court.

By § 402 of the Transportation Act of 1920, c. 91, 41 Stat. 456, 477, several new paragraphs were added to § 1 of the Act to Regulate Commerce as theretofore amended. Paragraphs 18, 19 and 20 are copied in the margin.[1] By

---

[1] (18) After ninety days after this paragraph takes effect, no carrier by railroad subject to this Act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this Act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

(19) The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time prescribe, and the provisions of this Act shall apply to all such proceedings. Upon receipt of any application for such certificate the Commission shall cause notice thereof to be given to and a copy filed with the governor of each State in which such additional or extended line of railroad is proposed to be constructed or operated, or all or any portion of a line of railroad, or the operation thereof, is proposed to be abandoned, with the right to be heard as hereinafter provided with respect to the hearing of complaints or the issuance of securities; and

them Congress has undertaken to regulate the construc-. tion and acquisition of new or additional lines of railroad and the extension and abandonment of old lines, and to invest the Interstate Commerce Commission with important administrative powers in that connection. Like the act of which they are amendatory, these paragraphs are expressly restricted to carriers engaged in transporting persons or property in interstate and foreign commerce.[2]

Our present concern is with the provisions relating to the abandonment of existing lines. They declare that

said notice shall also be published for three consecutive weeks in some newspaper of general circulation in each county in or through which said line of railroad is constructed or operates.

(20) The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both.

[2] See amended paragraphs (1) and (2) of the Act to Regulate Commerce as set forth in § 400 of the Transportation Act of 1920.

" no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment" (par. 18)'; that when application for such a certificate is received the Commission shall cause notice thereof to be given to the Governor of the State wherein the line lies and published in newspapers of general circulation in each county along the line, and shall accord a hearing to the State and all parties in interest (par. 19); that the Commission may grant or refuse the certificate in whole or in part and impose such terms and conditions as in its judgment the public convenience and necessity require; and that when the certificate is issued, and not before, the carrier may, " without securing approval other than such certificate," comply with the terms and conditions imposed and proceed with the abandonment covered by the certificate (par. 20).

The Eastern Texas Railroad Company, a Texas corporation, owns and operates in that State a line of railroad 30.3 miles in length. Approximately three-fourths of the traffic over the road is in interstate and foreign commerce and the rest is in intrastate commerce. The company neither owns nor operates any other line. The road was constructed in 1902 to serve extensive lumber industries, but in subsequent years the adjacent timber was removed and the mills dismantled. The company claims that since 1917 the road has been operated at a loss.

On June 3, 1920, the company filed with the Commission an application for a certificate authorizing it to abandon and cease operating its road, full notice of the application being regularly given. The State declined to appear before the Commission, but others, who were being served by the road, appeared and opposed the application. A full hearing was had and, on December 2, 1920, the

Commission made and filed a report concluding as follows: "Upon consideration of the record we find that the present public convenience and necessity permit the abandonment of the applicant's line, and we further find that permission to abandon the line should be made subject to the right of persons interested in the community served to purchase the property at a figure not in excess of $50,000. A certificate and order to that effect will be issued." The certificate and order were issued and the railroad company indicated its assent to the condition imposed, but, so far as appears, no one sought to purchase under the condition.

While the application was pending before the Commission and before the certificate was issued, the State brought a suit in one of its courts against the railroad company and some of its officers to enjoin them from ceasing to operate the road in intrastate commerce. The bill was brought on the theory that under the laws of the State the company was obliged to continue the operation of the road in intrastate commerce; that the provisions of the Transportation Act were unconstitutional and void, if and in so far as they authorized the abandonment of such a road as respects intrastate commerce; and that the company in asking the Commission to sanction such an abandonment was proceeding in disregard of its obligations to the State. At the instance of the defendants the suit was removed to the District Court of the United States for the Western District of Texas. During the pendency of the suit the Commission issued the certificate and the defendants then sought the benefit of it by a supplemental answer. The court held that the certificate constituted a complete defense, and without a hearing on other issues dismissed the suit. The State appealed directly to this court. That appeal is No. 298.

After the Commission granted the certificate the State brought a suit in the District Court of the United States

for the Eastern District of Texas against the United States, the railroad company and others to set aside and annul the Commission's order and certificate on the grounds, first, that the provisions of the Transportation Act, rightly interpreted, did not afford any basis for granting a certificate sanctioning the abandonment of the company's road as respects intrastate commerce, and, secondly, if those provisions purported to authorize such a certificate, they were to that extent in excess of the power of Congress and an encroachment on the reserved powers of the State. The defendants moved to dismiss the bill as ill founded in point of merits, and the court sustained the motions and entered a decree of dismissal. The State appealed directly to this court. That appeal is No. 563.

Counsel attribute to these cases a breadth which they do not have; and for obvious reasons we shall deal with them as they are, not as they might be.

Up to the time the Commission made the order granting the certificate a part of the commerce passing over the road was interstate and foreign, that is, was bound to or from other States and foreign countries. It is not questioned that Congress could, nor that it did, authorize the Commission to sanction a discontinuance of this interstate and foreign business. Neither is it questioned that the Commission's certificate was adequate for that purpose. The only matters in controversy are whether, by paragraphs 18, 19 and 20, Congress has assumed to clothe the Commission with authority to sanction the entire abandonment of a road such as this, and, if so, whether the power of Congress extends so far.

The road lies entirely within a single State, is owned and operated by a corporation of that State, and is not a part of another line. Its continued operation solely in intrastate commerce cannot be of more than local concern. Interstate and foreign commerce will not be burdened or affected by any shortage in the earnings, nor will

any carrier in such commerce have to bear or make good
the shortage. It is not as if the road were a branch or
extension whose unremunerative operation would or
might burden or cripple the main line and thereby affect
its utility or service as an artery of interstate and foreign
commerce.

. . If paragraphs 18, 19 and 20 be construed as authorizing
the Commission to deal with the abandonment of such a
road as to intrastate as well as interstate and foreign com-
merce, a serious question of their constitutional validity
will be unavoidable. If they be given a more restricted
construction, their validity will be undoubted. Of such a
situation this court has said, "where a statute is sus-
ceptible of two constructions, by one of which grave and
doubtful constitutional questions arise and by the other
of which such questions are avoided, our duty is to adopt
the latter." *United States* v. *Delaware & Hudson Co.*,
213 U. S. 366, 407–408.

Although found in the Transportation Act, these para-
graphs are amendments of the Interstate Commerce Act
and are so styled. They contain some broad language,
but do not plainly or certainly show that they are in-
tended to provide for the complete abandonment of a road
like the one we have described. Only by putting a liberal
interpretation on general terms can they be said to go so
far. Being amendments of the Interstate Commerce Act
they are to be read in connection with it and with other
amendments of it. As a whole these acts show that what
is intended is to regulate interstate and foreign commerce
and to affect intrastate commerce only as that may be in-
cidental to the effective regulation and protection of com-
merce of the other class. They contain many manifesta-
tions of a continuing purpose to refrain from any regula-
tion of intrastate commerce, save such as is involved in
the rightful exertion of the power of Congress over inter-
state and foreign commerce. *Minnesota Rate Case*, 230

U. S. 352, 418; *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co.*, 257 U. S. 563. And had there been a purpose here to depart from the accustomed path and to deal with intrastate commerce as such independently of any effect on interstate and foreign commerce, it is but reasonable to believe that that purpose would have been very plainly declared. This was not done.

These considerations persuade us that the paragraphs in question should be interpreted and read as not clothing the Commission with any authority over the discontinuance of the purely intrastate business of a road whose situation and ownership, as here, are such that interstate and foreign commerce will not be burdened or affected by a continuance of that business.

Whether, apart from the Commission's certificate, the railroad company is entitled to abandon its intrastate business is not before us, so we have no occasion for considering to what extent the decisions in *Brooks-Scanlon Co.* v. *Railroad Commission of Louisiana*, 251 U. S. 396, and *Bullock* v. *Railroad Commission of Florida*, 254 U. S. 513, may be applicable to this road.

As the District Courts both accorded to the Commission's certificate a wider operation and effect than can be given to it consistently with the provisions of paragraphs 18, 19 and 20 as we interpret them, the decrees must be reversed and the causes remanded for further proceedings in conformity to this opinion.

*Decrees reversed.*