## UNITED STATES FELDSPAR CORPORATION v. UNITED STATES et al.

District Court, N. D. New York.

February 12, 1930.

Karl Knox Gartner, of Washington, D. C., for petitioner.

Edward C. Bailly, of New York City, for the trust company and railway.

J. Stanley Payne, of Washington, D. C., for Interstate Commerce Commission.

Elmer B. Collins, of Washington, D. C., for the United States.

Nathan L. Miller, of New York City, for Board of Hudson River Regulating Dist.

Before L. HAND, Circuit Judge, and HAZEL and COOPER, District Judges.

L. HAND, Circuit Judge.

The railway operates an electric line along the Mohawk river between Schenectady, Gloversville, and Fonda in New York; no question concerns this. It also operates a steam

line from Fonda through Gloversville to a little village in Fulton county, N. Y., called Northville. The controversy turns about the abandonment of the northern part of this line from a point called Broadalbin Junction to Northville, a distance of twelve, out of a total of twenty-five and a half miles. The steam road throughout its length is engaged in interstate commerce, but its terminals are in the state of New York. On August 2, 1922, the state organized the Board of Hudson River Regulating District under section 432 of its Conservation Law (Consol. Laws N. Y. c. 65); its purpose being to regulate the flow of the Hudson river so as at once to prevent disastrous spring freshets, and to feed the channel during summer droughts. Among the necessary reservoirs to accomplish this was that created by the stoppage of Sacandaga creek by a dam at Conklingsville, which when filled will overflow some six miles of the railway's track north of Broadalbin Junction. The Board condemned the land within the flowage area in the state courts, which, anticipating the possibility that the Interstate Commerce Commission might not consent to the abandonment of the line between the junction and Northville, awarded a sum sufficient to relocate a new track west of the proposed shore of the reservoir. After the condemnation proceedings had ended, to avoid an appeal, the state agreed to pay at once the award, including this allowance; the money being deposited in the New York Trust Company, which is made a party here only for that reason. The railway conveyed the property condemned and promised to apply immediately to the Interstate Commerce Commission for a certificate of abandonment of the trackage between the junction and Northville; and in the event of failure, to build a track on the alternative line with the money allowed. It resulted that if the certificate was given, the allowance would become the unrestricted property of the railway for such purposes as it chose. Such a chance the state was willing to take to expedite the construction of the reservoir.

Thereupon, the railway applied to the Interstate Commerce Commission for leave to abandon this part of its steam line, and after hearings duly had the Commission issued its certificate. The petitioner at bar intervened in these proceedings on its own behalf and protested against the proposed step. It showed that it had a mill for grinding feldspar within a mile of Cranberry creek, a station on the line about seven miles north of the junction, and that to this station it had built a spur from the mill for the carriage of

its product. The quarry which fed the mill was three hundred and fifty acres in area and about two and a half miles away, the ore being carried thence by aerial tramway, and ground to a fine powder in the mill. The product was then loaded into cars and shipped direct to the buyers—many of whom were in other states—who emptied the cars into their factories by pneumatic tubes. In some cases shipments are made in less than carload lots, contained in bags and the like.

The petitioner's shipments had not been large up to the time of the proceedings, nor the resulting revenue to the railway; until August of 1929 the gross receipts had come to no more than fourteen hundred dollars, but the petitioner was sanguine of increasing its output, and there was some reason for its hopes. It argued that if the railway was abandoned, on the faith of which it had built, it would be unable to ship its product, and must remove the mill at least to the new rail head at an expense of two hundred and fifty thousand dollars. On the other hand, at the opening of the proceedings its counsel had agreed that it would not object to the abandonment, "if the railroad will agree to give freight service in transporting the product of the United States Feldspar Corporation by some other means than railroad and to the same extent that that freight service is now being given."

The Commission took much evidence as to the character of the population and industries served by the road, from which it appeared that both had steadily dwindled since the rails were laid in 1875. Much of the industry was glove making, whose products could be moved by motortrucks, for which adequate roads were available, and there was some lumbering—though this too had declined —and some quarrying of stone, which must however end, as the reservoir would flood the source. An amusement park had in the past furnished traffic for the railway, but the reservoir was to mutilate this, and it was doubtful whether the remnant would prove attractive to pleasure seekers.

The income of the road from the trackage to be abandoned was in dispute. In its return to the Public Service Commission of New York the railway had represented it as about ninety-three thousand dollars net, which was that proportion of the total net income from all its steam trackage, that the mileage of the trackage to be abandoned bore to the total steam trackage operated. At the hearings it introduced a quite different computation, estimating in detail the revenues actual-

ly received from the operation of the trackage here in suit, and the expenses properly allocable against it. This showed a loss of some five thousand dollars in operation, without any allowance for interest, or other carrying charges which would not be affected by the abandonment, and the Commission accepted it as true.

It granted a certificate of convenience and necessity under section 1(20) of the Interstate Commerce Act as amended by section 402 of the Transportation Act (49 USCA § 1(20), allowing the railway to abandon the trackage in question, the effective date of which has been set at February 24, 1930. After several unsuccessful efforts to secure a modification of this action, especially by making the certificate conditional upon a relocation of the road, the petitioner filed this suit, under section 41(28), Title 28 of the United States Code (28 USCA § 41(28). It joined not only the United States as therein provided, but the railway and the Board, and prayed an injunction: (1) restraining the enforcement of the certificate, (2) requiring the railway to relocate its line, and (3) forbidding the Board to flood the present tracks until this had been done. The case now comes up before a court constituted under section 47, title 28 of the United States Code (28 USCA § 47), upon a motion for a preliminary injunction to compel a maintenance of the status quo until final decree.

We pass the question whether in any case the Board, an agency of the state, may be made a party to such a suit; both the United States and the Board have moved to dismiss the petition upon the merits, the last without raising any question of its immunity from process. We assume with all the parties that the Commission meant more than to authorize an abandonment of the use of the track in interstate commerce; that it meant to authorize its abandonment for all purposes. The certificate would not otherwise have been given, because the Commission would scarcely have allowed the railway to give up interstate carriage and to go on with intrastate, a result which would merely increase its difficulty in handling its interstate commerce over the remainder of the line, stripped as it would then be of even the modest contribution which came from interstate freights upon the trackage in question. The question is really whether Texas v. Eastern Texas R. R. Co., 258 U. S. 204, 42 S. Ct. 281, 66 L. Ed. 566, rules, or Colorado v. U. S., 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878, and upon that there is no room for doubt.

■■■ It is true that the corporate ownership of a carrier's lines does not determine its character as an interstate or intrastate; that depends upon the nature of the business which it does. Cincinnati, N. O. & Tex. Pac. Ry. v. Interstate Com. Com., 162 U. S. 184, 16 S. Ct. 700, 40 L. Ed. 935; Southern Pac. Term. Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 S. Ct. 379, 55 L. Ed. 310; Baer Brothers v. Denver & Rio Grande R. R., 233 U. S. 479, 34 S. Ct. 641, 58 L. Ed. 1055; Texas v. Eastern Texas R. R. Co., 258 U. S. 204, 42 S. Ct. 281, 66 L. Ed. 566. When, however, the question of abandonment arises, the extent of that ownership may prove critical. In such a case it can indeed make no difference whether it keeps on in intrastate commerce, if it has abandoned interstate commerce over all its right of way. Its losses or gains, in general its economic fate, cannot thereafter affect national transportation, however broadly viewed; it may be left to the authority of the state whose interests alone it can then affect. Such cases are rare. If, however, it remains an interstate carrier over any part of its right of way, its general economic integrity is of interest to the nation, and is for that reason within its protection. Such is the distinction between the two cases cited, as stated in the opinion of Mr. Justice Brandeis in Colorado v. United States.

■■■ In the case at bar the railway continued upon the remainder of its line to carry on interstate commerce. To be sure, the report of the Commission does not expressly so find, but the proof shows it, the petitioner did not question it, and the report presupposes it. It was therefore within the jurisdiction of the Commission to determine whether a part of the tracks should be abandoned not only for interstate, but for intrastate commerce; it need not leave it a parasite upon the national system of transportation. The only question is whether that jurisdiction has been abused, a matter over which our powers of review are limited; very properly, in view of the greater experience of the Commission in such matters. U. S. v. Louisville & N. R. R., 235 U. S. 314, 320, 35 S. Ct. 113, 59 L. Ed. 245; Manufacturers' Ry. v. U. S., 246 U. S. 457, 482, 38 S. Ct. 383, 62 L. Ed. 831; Seaboard Air Line v. U. S., 254 U. S. 57, 62, 41 S. Ct. 24, 65 L. Ed. 129; Western Chemical Co. v. U. S., 271 U. S. 268, 271, 46 S. Ct. 500, 70 L. Ed. 941; Assigned Car Cases, 274 U. S. 564, 580, 47 S. Ct. 727, 71 L. Ed. 1204.

The territory served by the abandoned line has long been dying economically, and such needs as it still has can be substantially met by motortrucks with few exceptions. There are adequate motor highways, and a railway can do little that these could not supersede save in hauling the petitioner's pulverized ore. Even as to this its necessity is somewhat doubtful, in view of the concession upon the hearings. However, it was stated at the bar that if the petitioner could not directly fill cars at the mill, it must accept a freight classification so much higher than what it now enjoys that it cannot compete, and while this was not proved, we are content to assume as much. It may not, however, insist upon the maintenance of a burdensome line solely for its own benefit; the conflict of interests so arising is precisely the kind of question which the Commission is set up to solve.

The only matter open to doubt is the ambiguity in the proof arising from the railway's own inconsistencies in the allocation of its income. It now repudiates its return to the Public Service Commission of New York, and insists that it operates these miles of track at a loss, and the Commission has accepted its later proof, ignoring the return. It is apparent why this was done; an allocation of gross income and gross expenses upon a mileage basis is obviously inappropriate to a case where the traffic upon part of the line is dense, and upon the remainder, sparse. Whatever the admissions of the railway, the Commission had other interests to protect; it was not acting to relieve the road, but to secure the best service for those who might need that service. No estoppel is relevant upon that inquiry, no inconsistency important, except as it helps to ascertain the very truth; the inquiry is not to be assimilated to the ordinary suit inter partes, where no more is at stake than the settlement of a private dispute. This out of the way, there is no reason to suppose that the figures accepted by the Commission are not as reliable a means of reaching the truth as any available. At least, they constitute that "substantial evidence" of support for the findings which stops our review.

We see no reason therefore to interpose. We agree that the case is not to be judged in the light of what will best serve interstate commerce alone. It might have been best to abandon part of the line in the interest of interstate commerce, though it was vital to the necessities of the local community. The power to decide whether in that case it should be abandoned is certainly vested in the Commission, the representative of the nation, but its exercise for that very reason must be national, and the whole comprises all its parts. Each part has its claim, the state where the road may be along with the rest; else we should be forced into a paradox, since only remoter interests could be regarded, a new and odious sectionalism. We are faced with no such dilemma here; there is not the slightest reason to suppose that the Commission ignored the interests of the state of New York, or failed to balance them against those of other states. It had before it the question of how the award should be expended to the benefit of all concerned, whether in new construction, or to relieve the general necessities of a hard pressed road. We can find no reason to suppose that its judgment was mistaken; none surely which would justify our intervention.

As to the United States the petition must therefore be dismissed and its motion is granted. As to the Board the case is somewhat different. If it be a proper party to the petition at all, any cause of suit against it necessarily falls with our finding that the certificate is valid. From this it follows that the railway may abandon the road and is not required, nor indeed authorized, to relocate it elsewhere. If so, nothing can prevent the Board from flooding the tracks, which it holds by condemnation without condition. If the suit be regarded as brought against the Board under section 380 of title 28 (28 USCA § 380), the same result follows. The Board's motion will therefore be granted. In so far as concerns the prayer for an injunction against the railway if properly a party in a suit under section 41(28) of title 28 (28 USCA § 41 (28), the same considerations apply. The petitioner has no cause of suit against it as part of this proceeding.

If the petition be regarded as a bill in equity against the railway to compel it to perform a contract between itself and the state by relocating its line (the cause being between citizens of different states), the court as at present constituted has no jurisdiction over it. Judge Cooper denies any injunction on this ground for the reasons just given; the railway has no authority to relocate its line, and the contract, if there were any, could not be enforced. If the petitioner wishes to reframe the petition so as to reach any part of the award, any questions so arising are to be taken up before Judge Cooper in due course.

The petition is dismissed as against the United States and the Board; the motion for

a preliminary injunction against the railway is denied; the statutory court is dissolved; the petition may stand over for such further action before Judge Cooper as the petitioner may be advised.