## STATE v. WESTERN UNION TEL. CO.

Common Pleas Court, Franklin County.

No. 174412.   Decided May 4, 1949.

Hugh S. Jenkins, Herbert S. Duffy, Attys, Genl., Kenneth B. Johnston, Asst. Atty. Genl., Harry G. Fitzgerald, Jr., Special Counsel, Columbus, for plaintiff.

Vorys, Sater, Seymour & Pease, Columbus, John H. Waters, Genl. Atty., Wm. G. H. Atcheson, Asst. Genl. Atty., New York City, for defendant.

Frederick G. Hamley, Austin L. Roberts, Jr., Washington, D. C., for National Association of Railroad and Utilities Commissioners, amicus curiae.

## OPINION

By GESSAMAN, J.

This case is before the Court upon the demurrer of the plaintiff to the answer. The ground upon which plaintiff bases its demurrer is that the answer is insufficient in law to constitute an answer to the relief prayed for by the plaintiff.

The action has been brought by the State of Ohio through the Attorney General on behalf of the Public Utilities Commission of Ohio (hereinafter referred to as P.U.C.O.). The petition alleges in substance that the defendant is a common carrier of messages in intra-state commerce within the State of Ohio and as such is subject to the jurisdiction of the State of Ohio and to the regulation of the P.U.C.O.; that on or about April 1, 1947, it came to the attention of P.U.C.O. that the defendant had by application to the Federal Communications Commission (hereinafter referred to as F.C.C.) proposed to discontinue, abandon and substitute its Class 1-B telegraph offices at Bellefontaine, Delphos, Lebanon, Marysville, Mt. Gilead and Ottawa, Ohio, and to substitute service therein by local telephone companies under the management of the Telephone Service Company of Ohio; that the defendant had made no application therefor to the P.U.C.O. and such proposed action "affects local business of transmitting telegraphic messages between points in Ohio;" that such proposed action might be and could be unjust, unreasonable and discriminatory and the rights and interests of citizens of Ohio appeared to be affected thereby and that it is the duty and obligation of P.U.C.O. to determine whether such proposed change is "an abandonment in service requiring application to, hearing by, and order of said Utility Commission;" that on April 22, 1947, upon its own motion P.U.C.O. ordered the defendant to show cause why an application for said proposed action should not be filed with P.U.C.O. "as required by Sections 504-3, General Code;" that a hearing was had upon said order at which time the defendant appeared by counsel for the purpose of denying the jurisdiction of the State of Ohio and P.U.C.O. over the proposed change; that "after proper hearing and consideration of all issues involved therein," P.U.C.O. found that the proposed change "is abandonment, substitution or change in service as contemplated by Sections 504-2 and 504-3 of the General Code, requiring application to and approval of the P.U.C.O. insofar as transmitting of intra-state messages are concerned"; that P.U.C.O. further directed the defendant to file an application with and receive approval of the P.U.C.O.

"prior to making the contemplated or proposed abandonment or change in service to be rendered to the public in the State of Ohio;" that the defendant did not appeal from any of said orders and that therefore they have become final and effective; that the defendant has entered into two contracts with the Telephone Service Company of Ohio by which it proposes to carry into effect the anticipated changes.

It is further alleged that the defendant filed its application No. T-D-770 on December 27, 1946, with F.C.C. under Section 214 of the Communications Act of 1934, 47 U.S.C.A. § 214, wherein a request was made for authority of F.C.C. to make the proposed change; that as a result of said application and the hearing thereon, F.C.C. issued a proposed report on February 13, 1948, recommending the proposed change and that an appropriate order and authorization for the same will be issued.

It is further alleged that defendant has and will continue to refuse to comply with the above orders of P.U.C.O. and that unless restrained by this Court, it will consummate its abovementioned agreements with Telephone Service Company of Ohio and will immediately proceed to make the proposed change already referred to.

Plaintiff prays that the defendant be enjoined from proceeding under said contracts with the Telephone Service Company of Ohio and from making the proposed change "without first complying with the lawful order of June 17, 1947, of the P.U.C.A. and the laws of the State of Ohio."

In its answer the defendant admits that the action is brought upon behalf of the P.U.C.O.; that the order of April 22, 1947, was issued by P.U.C.O.; that a hearing was held thereon on May 14th and 15th, 1947, at which time defendant appeared by counsel for the purpose of denying jurisdiction of the State of Ohio and P.U.C.O.; that P.U.C.O. found that the proposed change "is abandonment, substitution or change in service"; that P.U.C.O. directed the defendant to file an application with and receive approval of the P.U.C.O. for the proposed change; that defendant has entered into two contracts with the Telephone Service Company of Ohio to which we have already referred and that the defendant has filed its application No. T-D-770 with F.C.C. for authority to make such change and that the proposed report of F.C.C. was issued as alleged in the petition.

The defendant generally denies all allegations of the petition which it has not expressly admitted to be true. The defendant alleges in its answer that it is and for many years

has been engaged as a common carrier in the transmission of messages for hire in and between all of the states of the United States and is engaged in inter-state, intra-state and foreign commerce; that on December 27, 1946, it filed its application, to which we have already referred, with F.C.C.; that the services "for the discontinuance of which defendant made application are services rendered in the transmission of messages and service incidental thereto in inter-state and intra-state commerce" and "the intra-state services and the inter-state services are in all respects alike except in point of origin or destination and said services are furnished by means of offices, equipment and personnel, identical use of which is made in the transmission of messages incidental thereto, whether such messages and incidental service are in intra-state commerce or inter-state commerce"; that in its application with F.C.C. the defendant proposed to "continue to render its services in the transmission of messages and services incidental thereto in inter-state and intra-state commerce, such services to be provided through teleprinter agency offices operated by local telephone companies, each under the management of the Telephone Service Company of Ohio"; that subsequent to the filing of said application F.C.C. caused notice of the filing of the application and the date of the hearing thereon to be served upon the Governor of Ohio and P.U.C.O. with leave to both of them to be heard in said proceedings and that P.U.C.O. entered its appearance and did participate in the hearing of said application; that on or about June 7, 1948, F.C.C. issued its report and found that neither the present nor future public convenience and necessity will be adversely affected by the granting of the application of the defendant and thereupon entered its order and authorization granting of the same. Allegations are also made relative to 47 U.S.C.A. §214(a—c) to which we shall later direct our attention. The defendant further alleges that P.U.C.O. has no power or authority to regulate or attempt to regulate "the discontinuance, reduction, impairment or abandonment of the services furnished by defendant in the six communities already referred to"; that whatever the power and authority of P.U.C.O. may have been prior to March 6, 1943, the Congress of the United States by the enactment of the communications Act of March 6, 1943, has preempted the field of regulation of the telegraph business and industry, not only in inter-state commerce but likewise in intra-state commerce insofar as the same concerns the discontinuance, reduction or impairment of telegraph service and the sole and ex-

clusive regulatory body having jurisdiction over such phase of the telegraph business or industry is now the Federal Communications Commission".

The defendant further alleges that since the adoption of the Communications Act of 1934 (Federal) as amended by the Act of March 6, 1943, 47 U.S.C.A. §151 et seq., and with respect to the provisions of the General Code of Ohio which plaintiff claims govern the defendant in the proposed change; "if those provisions are construed as requiring defendant telegraph company to apply to and to obtain from the P.U.C.O. permission to discontinue, reduce or impair telegraph service, they are in direct conflict with the Commerce clause of the Constitution of the United States and with the Federal Communications Act as amended"; that the June 17, 1947 order of P.U.C.O. is in direct conflict with the Commerce clause and also with the Federal Communications Act, as amended. To this answer, as we have already pointed out, the plaintiff has demurred on the ground that the facts alleged in the answer are insufficient to constitute a defense.

The questions raised, both of which have been discussed very fully by counsel for both parties and by counsel for the National Association of Railroad and Utilities Commissioners, amicus curiae, in support of the demurrer, are these:

1. Do §§504-2 and 504-3 GC require the defendant to secure P.U.C.O. approval for the particular changes which the defendant proposes to make?

2. Has Congress pre-empted the field of regulation of such cases?

**As to Question No. 1**

The pertinent provisions of §§504-2 and 504-3 GC are as follows:

"Sec. 504-2 GC. * * * and no public utility as defined in §614-2a GC furnishing service or facilities within the state of Ohio, shall abandon or be required to abandon or withdraw any * * * telegraph line * * * or any portion thereof * * * or the service rendered thereby * * * except as provided in §504-3 GC. Any * * * public utility violating the provisions of this section shall forfeit and pay into the state treasury not less than one hundred ($100.00) dollars, nor more than one thousand ($1,000.00) dollars, and shall be subject to all other legal and equitable remedies for the enforcement of the provisions of this act."

Sec. 504-3 GC. * * * any such public utility * * * desiring to abandon or close, or have abandoned, withdrawn or closed

for traffic or service all or any part of such line or lines, * * * shall first make application to the public utilities commission * * *. Upon the hearing of said application said commission shall ascertain the facts, and make its finding thereon, and if such facts satisfy the commission that the proposed abandonment, withdrawal or closing for traffic or service is reasonable, having due regard for the welfare of the public and the cost of operating the service or facility, they may allow the same; otherwise it shall be denied, or if the facts warrant, the application may be granted in a modified form. * * *"

If **P.U.C.O.** has any jurisdiction over the proposed change, that jurisdiction must be found in §§504-2 and 504-3 **GC**, commonly referred to as the Miller Act. That fact is admitted by all counsel concerned with this case.

It appears to the Court to be quite clear that the inhibition imposed by the General Assembly in §504-2 **GC**, is against the abandonment by a public utility of (as far as we are here concerned) a telegraph line or a portion thereof or of the service rendered thereby, for the word "abandon" is specifically used in that section. There is no reference to an alteration or to a change or to a substitution of the means to be used for rendering the service. The word "abandon" is again used in **§504-3 GC**, and as far as we are concerned in this case, the only positive requirement demanded of a public utility in that section is that before it **abandons** or **closes** any part or all of its line or lines, application therefor (that is, for an abandonment or a closing of the line or lines) must be made to P.U.C.O. and its consent therefor obtained. Therefore, it appears to the Court that the question here presented is whether or not the proposed change by the defendant constitutes an abandonment.

As we have already pointed out, and there is no dispute about the facts, the proposed changes at the towns to which we have already referred, will amount to the following: The defendant will close its own offices, known as Class 1-B offices, and the teleprinter machines and their operators will move from the present offices of the defendant to space set aside for them in the nearby telephone company offices, and the same direct telegraph services now tied into these machines in the Class 1-B offices will be tied into them in their new locations. All messages, both incoming and out-going, will be transmitted over the same wires and machines as before and will

be sent and received by the same operators. The only difference will be that the offices of the defendant in these respective towns will be closed; that certain supervisory and other help now employed therein will be eliminated or transferred and that the operators of the teleprinter machines and the messengers, etc. will be paid directly by the telephone company instead of by the defendant. In all other respects the service now rendered by the defendant to these communities will be continued. The **means** by which telegraph service has been rendered to these communities will be slightly altered. We consider it important to bear in mind that the proposed change by the defendant constitutes merely a change in the means by which the service is rendered but does not constitute a change in the service.

Numerous cases have been cited to the Court by counsel for the plaintiff, in all of which, jurisdiction by P.U.C.O. was sustained by the Supreme Court of Ohio. We shall not add to the length of this opinion by indulging in a detailed review of these cases. Suffice it to say that all of them involve a change in or abandonment of the service itself or a part of it. We are of the considered opinion that the situation here involved is very similar to that which was presented to the Supreme Court in the case of the **Pittsburgh & West Virginia Ry. Co. v. Public Utilities Commission of Ohio et al., 120 Oh St 434, 166 N. E. 372.** In that case the Wheeling and Lake Erie Railway Company applied to the P.U.C.O. for authority to abandon its then existing Ontario Street passenger station in the City of Cleveland and a portion of its railroad tracks extending northerly from Eagle Avenue, a distance of 1035 feet to the northerly terminus of its road in said city. The reason for the proposed change was that The Wheeling and Lake Erie Railway Company had entered into an agreement with the Cleveland Union Terminals Company for passenger station facilities and service in the new Cleveland Union depot. This new union depot which was then in the process of construction was adjacent to the Ontario Street station of Wheeling and Lake Erie and immediately north thereof. The portion of the Wheeling and Lake Erie tracks proposed to be abandoned had theretofore been used for the sole purpose of reaching the Ontario Street station. The application was dismissed by P.U.C.O. on the ground of want of jurisdiction. Appeal was taken from this order to the Supreme Court by the Pittsburgh and West Virginia Railroad Company, a connecting carrier and also a stockholder of Wheeling and Lake Erie. In considering the question involved, the Supreme Court had

this to say, **120 Oh St at pages 436** and **437, 166** N. E. at page 374 of its opinion:

"We are of the opinion that the Public Utilities Commission was correct in its conclusion that, in view of the fact that the applicant does not propose to discontinue operation into a downtown passenger station in Cleveland, or withdraw or impair its service to the public in that respect, but, on the contrary, proposes to secure and furnish to the public passenger station facilities and service, §§504-2 and 504-3 GC, have no application to the situation thus presented. The very evident purpose of these statutory provisions was to secure and safeguard the interests of the public, and prevent the **abandonment or withdrawal of a service,** thereby depriving . the public of facilities and service theretofore enjoyed, and to which it was entitled." (Emphasis ours.)

And further in the same opinion at page **437 of 120 Oh St,** at page 373 of 166 N. E. the Court says:

"Certainly no one would argue that an application need to be made to the Public Utilities Commission for permission to erect a new passenger station, or that it was contemplated to confer on the Public Utilities Commission any such jurisdiction by statute. The plan proposed is no more an abandonment of passenger station facilities than would be the substitution of a new passenger station by the Wheeling and Lake Erie upon the very location now occupied by its passenger station".

The case at bar presents, as we have said, a similar situation. The proposed change does not contemplate or involve the termination of telegraphic service either to or from the communities involved. It proposes only to change the station in each of these communities at which messages are both sent and received. In that respect it is similar to the substitution of one passenger station for another as was involved in the Wheeling and Lake Erie case. The same messages can be sent and the same messages can be received as under the present arrangement. The station at which they are sent and received will be the offices of the local telephone company instead of the present Class 1-B offices of the defendant. Therefore, while the present office or station is being abandoned, that abandonment affects only the means by which telegraphic messages are sent and received but does not

affect the telegraphic **service** itself, either incoming or outgoing.

The situation and question here presented are so similar to those involved in the Wheeling and Lake Erie case, supra, that we cannot escape the conclusion that the proposal by Western Union involves only a relatively minor change in the means by which telegraphic messages are sent and received and does not affect the telegraphic service to and from these communities and therefore does not constitute an abandonment or withdrawal of a service which the Miller Act was enacted to prevent. It, therefore, follows that there is no duty upon Western Union to make any application to P.U.C.O. for the proposed change and since the duty does not exist, it therefore follows that P.U.C.O. was without any authority to issue its order of April 22, 1947, in which it attempted to require Western Union to show cause why an application for said proposed action should not be filed with P.U.C.O. With respect to that order, we feel that we should point out that counsel for the plaintiff has not referred the Court to any authority lodged with P.U.C.O. for the adopting of the order of April 22, 1947, even granting that P.U.C.O. had jurisdiction in the matter.

Therefore, our answer to the first question propounded above is that §§504-2 and 504-3 GC do not require the defendant to secure P.U.C.O. approval for the changes which the defendant proposes to make and for the reasons which we have given, the demurrer is overruled.

**As to Question No. 2**

It is urged by counsel for the defendant that the intra-state and inter-state services of Western Union being inextricably intertwined, the intra-state service must be controlled in order to prevent an unreasonable burden on inter-state service. In the answer the defendant has alleged that Congress, by the Act of March 6, 1943, "has pre-empted the field of regulation of the telegraph business and industry, not only in interstate commerce but likewise in intra-state commerce insofar as the same concerns the discontinuance, reduction or impairment of telegraph service and the sole and exclusive regulatory body having jurisdiction over such phase of the telegraph business or industry is now the Federal Communications Commission."

Therefore, counsel for the National Association of Railroad and Utilities Commissioners, amicus curiae, state the question in this manner at page 2 of their brief:

"The primary issue which is before this court is whether the authority and jurisdiction of the Public Utilities Commis-

sion of the State of Ohio to regulate the discontinuance, reduction, impairment or abandonment of intra-state telegraphic service or facilities, has been superseded by Federal Regulation."

The consideration of this question requires the consideration of several sections of the Federal Communications Act as amended on March 6, 1943, 47 U.S.C.A. §151 et seq.

The purposes of the Act have been stated by Congress in Section 151 which reads in part as follows:

"For the purpose of regulating inter-state and foreign commerce in communication by wire * * * so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire * * * communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire * * * communication, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to inter-state and foreign commerce in wire * * * communication, there is hereby created a commission to be known as the 'Federal Communications Commission' which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter."

Congress then provided as follows in Section 152:

"(a) The provisions of this chapter shall apply to all inter-state and foreign communication by wire * * *."

Section 214 provides in part as follows:

"(a) * * * No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby. * * *

"(b) Upon receipt of an application for any such certificate, the Commission shall cause notice thereof to be given to, and shall cause a copy of such application to be filed with, the Secretary of the Army, the Secretary of the Navy, and the Governor of each State in which * * * such discontinuance, reduction, or impairment of services is proposed, with the

right to those notified to be heard; and the Commission may require such published notice as it shall determine.

"(c) The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of * * * discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. After issuance of such certificate, and not before, the carrier may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the * * * discontinuance, reduction, or impairment of service covered thereby."

From a consideration of these sections it is quite obvious that the absolute control of communication by wire in interstate and foreign commerce has been lodged by Congress in the Federal Communications Commission. Granting that this is correct, it is urged by counsel for the state that since Western Union in the operations here involved is engaged not only in inter-state commerce but also in intra-state commerce, it must not only secure the approval of F.C.C. but also that of the P.U.C.O. It is the opinion of the Court that the answer to that contention is obvious on its face, for if counsel for the state is correct, then one of two situations could result; (1) Western Union could be prevented from complying with the certificate issued by F.C.C. by an adverse decision by P.U.C.O., or (2) although complying with the certificate issued by F.C.C., Western Union could be compelled by P.U.C.O. to also continue the operation of its Class 1-B offices thereby nullifying the effect and purpose of the F.C.C. certificate. The power of P.U.C.O. to require the defendant to apply for approval would carry with it the power to deny the right to make the change. In either event the very purpose of the Federal Communications Act could be nullified by or at least controlled by anyone of the state agencies of the forty-eight states.

A large number of authorities have been submitted to the Court by counsel in this case, many of which we feel are not decisive of the question involved. In the opinion of the Court the case in point is that of State of Colorado v. United States et al., 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878. That suit was instituted by the State of Colorado, to enjoin and set

aside, in part, an order of the Interstate Commerce Commission issued February 11, 1924. The order was a certificate by that commission permitting the abandonment by the Colorado and Southern Railway Company of a branch line located wholly within the State of Colorado. The railway company was a Colorado corporation. It owned and operated in intra-state and inter-state commerce a railroad system located partly in Colorado and partly in other states. The branch line in question was constructed under the authority of Colorado and was acquired by the company. It was a narrow gauge line and was physically detached from other lines of the company but it was operated in both intra-state and inter-state commerce as a part of the system of the company by means of connections with other railroads. The certificate to abandon the line was granted by the Interstate Commerce Commission on the ground that the local conditions were such that public convenience and necessity did not require continued operation; that for years operation of the branch had resulted in large deficits and for other reasons, one of which was that "continued operation would constitute an undue burden upon interstate commerce" 271 U. S. at page 160, 46 S. Ct. at page 453. The Attorney General of Colorado contended, among other things, that neither the Interstate Commerce Act nor Transportation Act of 1920, 49 U.S.C.A. §1 et seq., took away from the state the right to regulate and control its intra-state commerce and to the extent that they, or either of them attempted to do so, they were unconsitutional, 271 U. S. at pages 154 and 155, 46 S. Ct. 452. The opinion in this case was written by Mr. Justice Brandeis and was unanimous. In discussing the claim of the attorney general, we find the following at pages 162, 163 and 164 of the opinion, in 271 U. S., at page 453 of 46 S. Ct.:

"In the case at bar no question of the reasonableness of the state's action can arise. because the state has not issued any order; it has merely protested against the Commission's releasing this Colorado corporation from the primary duty voluntarily assumed of maintaining some service on the branch. This, the Commission cannot do as respects intra-state commerce. Transportation Act 1920 did not purport to take from the state its powers to control intra-state commerce. Nor did it confer upon the Commission power to release a corporation chartered by the state from its primary obligation to furnish service. If paragraph 18 of section 1 should be construed as authorizing the Commission to do so without the

consent of the state, the provision would be unconstitutional. Compare [State of] Texas v. Eastern Texas R. Co., 258 U. S. 204, 217, 42 S. Ct. 281, 66 L. Ed. 566. Such is the argument.

"The argument rests upon a misconception of the nature of the power exercised by the Commission in authorizing abandonment under paragraphs 18-20. The certificate issues not primarily to protect the railroad, but to protect interstate commerce from undue burdens or discrimination. The Commission by its order removes an obstruction which would otherwise prevent the railroad from performing its federal duty. Prejudice to interstate commerce may be effected in many ways. One way is by excessive expenditures from the common fund in the local interest, thereby lessening the ability of the carrier properly to serve interstate commerce. Expenditures in the local interest may be so large as to compel the carrier to raise reasonable interstate rates, or to abstain from making an appropriate reduction of such rates, or to curtail interstate service, or to forego facilities needed in interstate commerce. Likewise, excessive local expenditures may so weaken the financial condition of the carrier as to raise the cost of securing capital required for providing transportation facilities used in the service, and thus compel an increase of rates. Such depletion of the common resources in the local interest may conceivably be effected by continued operation of an intra-state branch in intra-state commerce at a large loss.

"The sole objective of paragraphs 18-20 is the regulation of inter-state commerce. Control is exerted over instra-state commerce only because such control is a necessary incident of freeing inter-state commerce from the unreasonable burdens, obstructions or unjust discrimination which are found to result from operating a branch at a large loss. Congress has power to authorize abandonment, because the state's power to regulate and promote intra-state commerce may not be exercised in such a way as to prejudice interstate commerce. The exertion of the federal power to prevent prejudice to interstate commerce so arising from the operation of a branch in intra-state commerce is similar to that exerted when a state establishes intra-state rates so low that intra-state traffic does not bear its fair share of the cost of the service (Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A.L.R. 1086; Nashville, Chattanooga & St. Louis Ry. v. Tennessee, 262 U. S. 318, 43 S. Ct. 583, 67 L. Ed. 999), or when the state authorities seek to compel the erection of a union station so expensive as unduly to deplete the financial resources

of the carriers (Railroad Commission v. Southern Pacific Co., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713), or when one railroad seeks to construct an intra-state branch line, which will deplete its own financial resources or those of another inter-state carrier (Texas & Pacific Ry. Co. v. Gulf, Colorado & Santa Fe Ry. Co., 270 U. S. 265, 46 S. Ct. 263, 70 L. Ed. 578). The jurisdiction exercised by the Commission in these cases is in essence that which was invoked in The Shreveport Case. [Houston, E. & W. T. R. Co. v. United States] 234 U. S. 342, 34 S. Ct 833, 58 L. Ed. 1341, a power to prevent unjust preference to particular intra-state shippers or localities at the demonstrated expense of inter-state commerce. But there is a broader basis for federal control.

"This railroad, like most others, was chartered to engage in both intra-state and inter-state commerce. The same instrumentality serves both. The two services are inextricably intertwined. The extent and manner in which one is performed, necessarily affects the performance of the other. Efficient performance of either is dependent upon the efficient performance of the transportation system as a whole."

And also the following language at pages 165 and 166 of the opinion, in 271 U. S., at page 455 of 46 S. Ct.:

"The exercise of federal power in authorizing abandonment is not an invasion of a field reserved to the state. The obligation assumed by the corporation under its charter of providing intra-state service on every part of its line within the state is subordinate to the performance by it of its federal duty, also assumed, efficiently to render transportation services in inter-state commerce. There is no contention here that the railroad by its charter agreed in terms to continue to operate this branch regardless of loss. Compare Railroad Commission v. Eastern Texas R. Co., 264 U. S. 79, 44 S. Ct. 247, 68 L. Ed. 569. But even explicit charter provisions must yield to the paramount power of Congress to regulate inter-state commerce. [State of] New York v. United States, 257 U. S. 591, 601, 42 S. Ct. 239, 66 L. Ed. 385 Because the same instrumentality serves both, Congress has power to assume not only some control but paramount control insofar as inter-state commerce is involved It may determine to what extent and in what manner intra-state service must be subordinated in order that interstate service may be adequately rendered. The power to make the determination inheres in the United States as an incident of its power over inter-state commerce. The making of this determination involves an exercise of judgment

upon the facts of the particular case. The authority to find the facts and to exercise thereon the judgment whether abandonment is consistent with public convenience and necessity, Congress conferred upon the Commission."

At page 168 of the opinion in 271 U. S., at page 456 of 46 S. Ct. it is said that

"The sole test prescribed is that abandonment be consistent with public necessity and convenience. In determining whether it is, the Commission must have regard to the needs of both intra-state and inter-state commerce."

The Colorado case of course dealt with a railroad and with the Transportation Act but a comparison of that Act with the Communications Act discloses a marked similarity to the extent that one might even conclude that many of the provisions of the Communications Act were copied from the Transportation Act. A consideration of the provisions of the two acts has led the Court to the conclusion that the principles enunciated in the Colorado case are applicable to the case at bar, that is to say, that since in the communities involved, both intra-state and inter-state messages are now received and sent by means of the same wires and other facilities of Western Union, the two services are inextricably intertwined and the extent and manner in which one is performed necessarily affects the performance of the other. It follows, therefore, that the efficient performance of either is dependent upon the efficient performance of the system as a whole. Therefore, the power and authority of F.C.C. supersede that of P.U.C.O. for the reason that "the state's power to regulate and promote intra-state commerce may not be exercised in such a way as to prejudice inter-state commerce". 271 U. S. at page 163, 46 S. Ct. at page 454.

It is urged on behalf of the state that the language of the Federal Communications Act does not evidence any intent of Congress to supersede state authority. The intent of Congress was to regulate communications by wire in inter-state and foreign commerce for the purposes set forth in Section 151, supra, and while the express intent of Congress to supersede state authority is nowhere found in the Act, it necessarily follows, applying the principles of the Colorado case, that where the services, both intra-state and inter-state, are inextricably intertwined, the state's power is superseded to the extent that it is necessary to regulate inter-state commerce

for the purposes and in the manner specified in the Federal Communications Act.

It is the opinion of the Court, therefore, that in view of the conditions existing in the communities here involved and particularly the fact that the services of sending and receiving both intra-state and inter-state messages are inextricably intertwined, the authority of the F.C.C. with respect to the proposed change is final and that Western Union is under no duty to apply to P.U.C.O. for its permission to make the change. In this respect, the power and authority of F.C.C. supersede that of P.U.C.O.—if any authority of the latter in the premises, did exist. Our answer to question number two, therefore, is in the affirmative.

For the reasons given, it is our opinion that the answer states sufficient facts to constitute a defense. The demurrer is overruled.