IN RE APPLICATION OF FRONTIER AIRLINES, INC.
FRONTIER AIRLINES, INC., APPELLANT, v. NEBRASKA
DEPARTMENT OF AERONAUTICS ET AL., APPELLEES.
122 N. W. 2d 476

Filed July 5, 1963. No. 35315.

Marti, O'Gara, Dalton & Sheldon and William A. Nelson, for appellant.

Clarence A. H. Meyer, Attorney General, Rush C. Clarke, Bevin B. Bump, John C. Coupland, John B. Cassel, Andrew D. Mapes, Henry L. Holst, and Harry C. Sundblad, for appellees.

Lee Loevinger, Lionel Kestenbaum, Michael I. Miller, John H. Wanner, Joseph B. Goldman, O. D. Ozmont, Arthur R. Schor, John E. Stephen, and James E. Landry, for amici curiae.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This proceeding was commenced on March 22, 1961, by

the filing of an application by Frontier Airlines, Inc., before the Nebraska State Railway Commission. The application requested that the commission disclaim any jurisdiction over the matter of discontinuance of service over applicant's segment No. 13; and in the alternative that the commission authorize the discontinuance of that service.

The Department of Aeronautics of the State of Nebraska; the cities of Chadron, Valentine, Ainsworth, Norfolk, and Lincoln, Nebraska; the Chambers of Commerce of Valentine and Norfolk; and the Airport Authority of the city of Lincoln, filed protests to the granting of said application.

For convenience at times hereafter the Frontier Airlines, Inc., will be referred to as the applicant or Frontier; the protestants as such; and the Nebraska State Railway Commission as the commission.

The commission conducted extensive hearings in Ainsworth, Nebraska, during June and August of 1961, and a supplemental hearing at Lincoln, Nebraska, on January 5, 1962. On April 6, 1962, the commission entered its order denying the application in its entirety.

Frontier thereafter timely filed its motion for a rehearing which was overruled by the commission on May 2, 1962. Thereafter, Frontier brought the matter to this court on appeal.

Frontier is engaged in interstate commerce as a common carrier of persons, property, and mail. The whole system which it operates is properly described as its "route." The route consists of numerous segments, which together serve portions of the States of Arizona, New Mexico, Utah, Colorado, Wyoming, Montana, North Dakota, South Dakota, Missouri, Kansas, and Nebraska.

The route segments over which Frontier operates were established by virtue of a certificate of public convenience and necessity issued by the Civil Aeronautics Board, which for convenience will at times be referred to herein as the Federal Board, pursuant to

the provisions of the Federal Aviation Act of 1958, 49 U. S. C. A., § 1301 et seq. Applicant's total system is designated by the Federal Board as Route No. 73. The particular segment involved herein is No. 13 which, according to the certificate extended between Omaha, Nebraska, and Casper, Wyoming, via the intermediate points of Lincoln, Columbus, Norfolk, Ainsworth, Valentine, and Chadron in Nebraska, and Douglas and Lusk in Wyoming.

Applicant's certificate of public convenience and necessity was issued by the Federal Board on December 8, 1958. It reflected amendments to a prior certificate authorized by it also. The order was entered at the conclusion of an extended hearing generally called the Seven States Area Investigation, a proceeding in which the State of Nebraska and some, but not all, of the present protestants participated. The service authorized by that board clearly appeared from its order to be on an experimental basis in order to extend local service to small communities with unknown or marginal traffic potentialities contingent upon there being sufficient service to justify the heavy expenditures of federal subsidy, which would be required and which are authorized under 49 U. S. C. A., section 1376, subsection (b), which reads in part: "In determining the rate in each case, the Board shall take into consideration, among other factors, (1) the condition that such air carriers may hold and operate under certificates authorizing the carriage of mail only by providing necessary and adequate facilities and service for the transportation of mail; (2) such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law; and (3) the need of each such air carrier (other than a supplemental air carrier) for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and

efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

The Federal Board's order contained the following provisions:

"Keeping in mind the extensive new services awarded in the Seven States area at considerable expense to the carriers and the Government, we are adopting a companion policy looking toward an early and critical reassessment of the traffic results of the new authorizations to see whether the cities are making sufficient use of the air service they requested or should lose it. Specifically, under our 'use it or lose it' policy, each city will be required to meet a minimum standard of use, e. g., enplane an average of five or more passengers daily. Unless a city enplanes an average of at least five passengers daily for the 12 months following the initial six months of service, we will, in the absence of unusual or compelling circumstances, institute a formal investigation to determine whether that city should lose its air service for lack of use. This policy will be applicable regardless of whether the city has been certificated for a temporary or an indefinite period. And, it must be emphasized that those cities enplaning the bare minimum—an average of five daily passengers during the trial period— should not assume that continued air service for them is assured. * * *

"As in the case of individual cities, we will also reassess the traffic results of each new route segment for the same 12-month period, with a view toward suspension or deletion of segments that do not adequately respond to air service. If the passenger load on each flight serving a segment in question averages less than five passengers, we will begin appropriate proceedings to determine whether to suspend or delete the route segment. * * *

"In particular, where a community or segment fails to make adequate use of a subsidized service, the carrier is free to seek a voluntary suspension of service, even in advance of a proceeding to terminate the certification. Indeed, if a carrier fails to exercise adequate vigilance in this regard, it may reflect upon the economy and efficiency of management in subsidy mail pay proceedings under Section 406 of the Act."

The Federal Board, in appendix H attached to its decision and order, estimated the total revenue to be obtained in the future from all service revenue on segment No. 13 to be annually $503,461; and that the total annual expenses of the operation would be $782,687, requiring $279,226 to break even. It also estimated the return element for Frontier on its investment should be $37,335, and that the total mail subsidy needed from the United States for the operation of segment No. 13 would be $279,226 per year.

Frontier had prior to the making of the order of the Federal Board in the Seven States Area Investigation applied for and received a certificate of public convenience and necessity from the commission as a class B carrier for the year 1958, on September 25, 1958. It gave the holder of the certificate authority to engage in intrastate commerce in conformity with the laws of Nebraska and the rules of the commission and "in accordance with the authority heretofore granted the carrier by the Civil Aeronautics Board * * * and in accordance with the authority which may be hereafter granted the carrier by the Civil Aeronautics Board during the year 1958; provided, any suspension, cancellation, termination, or revocation by the Civil Aeronautics Board of the carrier's authority for any operation or service within the State of Nebraska shall likewise and simultaneously suspend, cancel, terminate, or revoke corresponding authority granted by this certificate; provided, further, termination or cancellation of the carrier's insurance or other security, as

approved by the Commission for the protection of the public, shall automatically and simuitaneously terminate and nullify the authority granted hereby."

Such certificates from the commission are issued according to its rules, Chapter II, article 2, section 3, to class B aircraft carriers described as interstate operators on filing their certificates obtained from the Federal Board without other showing.

With respect to other classes of carriers the rules and regulations prescribe a considerable number of requirements.

A like certificate was received by Frontier for the year 1959 dated February 13, 1959.

On August 9, 1960, the Federal Board entered an order granting a temporary suspension of segment No. 13 of Frontier's route and instituting an investigation with respect to the segment's permanent deletion under the "use it or lose it" policy of the board. Its order recited Frontier's having filed its application on February 8, 1960, and that all of the protestants in the proceeding now before us with other persons there filed a joint answer and a petition for an investigation into the adequacy of the service of Frontier in Nebraska and for the substitution of another carrier in place of Frontier. The board's order discloses that the contentions of the protestants then were much the same as are now raised by them herein. The Federal Board found that no intermediate point served only on segment No. 13 enplaned the required coverage number of five daily passengers, either during the 6 months' initial period of operation or in the 12 months following; that the passenger load figures for segment No. 13 averaged 3.8 passengers in 12 months ending March 31, 1960, and that in no month, except June 1959, had the average passenger load reached the minimum of seven passengers per flight as required in the board's order; that this average passenger load, instead of increasing, was declining; that all the cities on the route except Ainsworth and Valentine would con-

tinue to receive air service either from other segments of Frontier's route or from other airlines; that Ainsworth and Valentine enplaned only an average of 1.9 and 2.6 daily passengers, respectively, during the 12 months' period following the 6 months' period; and that the total subsidy cost of segment No. 13 operations was estimated to be $239,213. Consequently, more than $200,000 in subsidy would be required to furnish air service for those two towns generating an average of less than five passengers a day. The findings in the order recite: "It was not our intent in the Seven States case to afford air service to marginal points at unreasonable costs to the Government. * * * In other words, the energies which Frontier has expended on segment 13 have produced only meager passenger traffic which is not sufficient to warrant continued service; and Frontier could well utilize the same efforts on other more remunerative segments of its route, where there will be greater traffic response with an attendant increase in the margin of profit and better utilization of the subsidy dollar. Moreover, a substantial portion of the total subsidy attributable to segment 13 will be saved by the Government if service is suspended over that segment. This factor should not be overlooked."

The Federal Board also dismissed the request for an investigation as to the adequacy of Frontier's service contained in the answer and cross-petition of the protestants.

The various Nebraska parties to the proceedings before the Federal Board sought review from the order in federal court. The Court of Appeals, Eighth Circuit, affirmed the decisions of the Federal Board in its opinion filed January 4, 1962. Nebraska Department of Aeronautics v. Civil Aeronautics Board, 298 F. 2d 286. The proceedings heretofore set out are described in that opinion but the questions of jurisdiction between the federal and state authorities here considered are not touched upon.

On August 19, 1960, the commission adopted a rule which provides as follows: "Notwithstanding any other rule or regulation heretofore adopted by the Nebraska State Railway Commission, no aircraft carrier operating in intrastate commerce within the State of Nebraska as a scheduled operator shall discontinue any portion of such intrastate commerce until application has been made to this Commission and its permission had for that purpose." Ch. II, art. 2, § 3.7.

On August 29, 1960, the district court for Cherry County, Nebraska, made its order allowing a temporary injunction enjoining Frontier from abandoning any of its air transportation route between the cities of Chadron and Lincoln, Nebraska, and through intermediate cities of Valentine, Ainsworth, and Norfolk, Nebraska, except as to mail unless and until authority to do so is granted by the commission or the further order of the court.

Frontier was at the time of the hearing before the commission operating the service between Chadron and Lincoln in obedience to this injunction.

Thereafter, on October 19, 1961, subsequent to the commencement of this proceeding before the commission the Federal Board in a proceeding instituted on its own motion, in which the protestants herein and others from Nebraska were parties, permanently deleted segment No. 13 from Frontier's certificate of public convenience and necessity.

The applicant Frontier in the present case before us contends that the Federal Board had exclusive jurisdiction to discontinue the service over segment No. 13 and that its order temporarily suspending such service and thereafter permanently deleting and discontinuing the same was effective not only with respect to interstate commerce but intrastate commerce within the State of Nebraska as well, and that the commission had no right nor jurisdiction to require service over segment No. 13 thereafter.

It assigns error in the commission's ruling in not disclaiming jurisdiction over service on said segment. We sustain this assignment.

Though perhaps not necessary to this decision, the testimony taken in this proceeding clearly shows that the traffic over segment No. 13 was of both an interstate and intrastate character.

Exhibits of the applicant indicated that for the first 9 months in 1960 and the first 5 months of 1961, approximately 39 percent of the passengers using segment No. 13 were engaged in travel which involved interstate commerce. It clearly appears the protestants and the commission expected and desired that such a commingling of traffic continue. The record is replete with testimony of those complaining of service originating without the state and bound thereto and of those desiring to use the service for trips therefrom. Many witnesses from the territory about Valentine, Ainsworth, and elsewhere, gave evidence as to their desire that cattle buyers from Iowa, Illinois, Indiana, and elsewhere have this service available to them. Evidence of expert witnesses and others complained of the inadequacy of connections with airlines to Denver, Kansas City, and other points without the state. The protestants complained that the schedule on the segment was not inserted in the Official Airline Guide which is circulated throughout the nation and estimates of the loss of traffic from without the state because thereof were attempted. Segment No. 13 described in the Federal Board's order and certificate ran from Omaha to Casper, Wyoming. It was obviously an interstate segment. After the temporary suspension of this service by the Federal Board on August 9, 1960, Casper, a city of 30,000 inhabitants, together with the Wyoming cities of Douglas and Lusk were no longer served. The remaining operations of segment No. 13 continued under the injunction and by the commission ended on the west at Chadron, a city whose population was 5,079 in 1960. After the suspension of segment No.

13, Frontier was and is still engaged in interstate commerce. Frontier's segment No. 10, operated from Rapid City, South Dakota, through Hot Springs, South Dakota, and on through Chadron, Alliance, and Scottsbluff, Nebraska, and from there to Cheyenne, Wyoming, with a terminal at Denver, Colorado. It still operated segment No. 12 from Omaha, Nebraska, through Lincoln, Grand Island, North Platte, and Sidney in Nebraska, and to Cheyenne, Wyoming, with a terminal at Denver, Colorado. This was commonly referred to as the Central Nebraska Route. Its segment No. 11 began at the terminal at Denver, Colorado, through Sterling, Colorado, Sidney, Imperial, McCook, Kearney, Hastings, and Lincoln, Nebraska, with a terminal at Omaha. It was known as the Southern Nebraska Route. There was also segment No. 14 from the terminal at Omaha through Lincoln and Beatrice, Nebraska, on to St. Joseph, Missouri, with a terminal at Kansas City, Missouri. Planes on segment No. 13 flew into the airports at Chadron, Lincoln, and Omaha, and passengers could and did change planes at these airports. Its whole route No. 73 operated in the 11 states as formerly.

Moreover, Frontier's route No. 73 was engaged in carrying the mail and was heavily subsidized by the United States government. In 1960, its passenger revenue was $6,352,584. From cargo it received $469,183, and from charter and miscellaneous income $250,746. Its income from the United States for carrying the mail, which is spoken of as the mail subsidy, was $6,687,600. Its operational flying expense was $13,227,107. It is obvious that but for the mail subsidy it could not operate. The figures for 1959 are in substance proportionately the same.

At this point we turn our attention to the general law which we deem to be applicable to the case before us.

In 11 Am. Jur., Commerce, § 9, p. 11, it is stated: "The power of Congress to regulate commerce among the several states and with foreign nations is supreme and ple-

nary; it is complete in itself and knows no limitations except the prohibitions and limitations of the United States Constitution and its amendments, and includes the power in certain circumstances to prohibit interstate and foreign commerce." See, also, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 57 S. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352; Kentucky Whip & Collar Co. v. Illinois C. R. R. Co., 299 U. S. 334, 57 S. Ct. 277, 81 L. Ed. 270.

In 11 Am. Jur., Commerce, § 10, p. 12, it is said: "It has repeatedly been held by the courts that where a subject is national in its character and admits and requires uniformity of regulation, affecting alike all the states, such as transportation between the states, including the importation of goods from one state to another, Congress alone can provide the needed regulations. In such a case the Federal power is exclusive, and the states may not act even though Congress has not exerted its legislative authority, the silence of Congress being equivalent to a declaration that the particular commerce shall be free from regulation." See, also, United Air Lines, Inc. v. Nebraska State Railway Commission, 172 Neb. 784, 112 N. W. 2d 414.

As to regulation of agencies which are engaged in and affect both interstate and intrastate commerce the rules appear in 11 Am. Jur., Commerce, § 14, p. 16, as follows: "The power of Congress does not extend to the purely internal or intraterritorial commerce of the states. * * * However, the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. On the contrary, wherever interstate and intrastate transactions are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority and the state, and not the nation, would be supreme within

the national field. Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." See, also, United States v. Walsh, 331 U. S. 432, 67 S. Ct. 1283, 91 L. Ed. 1585; Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878; United States v. Darby, 312 U. S. 100, 61 S. Ct. 451, 85 L. Ed. 609, 132 A. L. R. 1430.

The power of Congress over interstate commerce extends to those intrastate activities which so affect interstate commerce or the exercise of the power of Congress over it as to make appropriate the attainment of a legitimate end of Congress. United States v. Darby, *supra*.

While Congress cannot delegate power to regulate foreign or interstate commerce to a state or municipal corporation, it may leave certain matters or details to officers, departments, or commissions without violating the rule. 15 C. J. S., Commerce, § 8, p. 265.

With these general rules before us it is now necessary to discuss the statutes which Congress has enacted with respect to aviation. The present act regulating aviation was enacted by Congress on August 23, 1958. It is set out in 49 U. S. C. A., § 1301 et seq. It is there designated as "Federal Aviation Program [New]." It replaced a former act regulating aviation enacted in 1938. Both applicant and protestants agree that so far as this litigation is concerned there is little difference in the application of the two acts. The act is long and detailed and our opinion will discuss only certain sections which we believe are decisive of this appeal. They will be taken from 49 U. S. C. A., but only the section number will be given. Section 1301 gives the definitions used throughout the act. It includes the following subsections: "(3) 'Air carrier' means any citizen of the United States who undertakes, whether directly or indirectly

or by a lease or any other arrangement, to engage in air transportation; * * * (4) 'Air Commerce' means interstate, overseas, or foreign air commerce or the transportation of mail by aircraft or any operation or navigation of aircraft within the limits of any Federal airway or any operation or navigation of aircraft which directly affects, or which many endanger safety in, interstate, overseas, or foreign air commerce. * * * (10) 'Air transportation' means interstate, overseas, or foreign air transportation or the transportation of mail by aircraft."

Subsection (20) gives the definition of "Interstate Commerce." It is long and will not be quoted but its substance as applicable to this litigation means commerce from a place in one state to a place in any other state.

Section 1321 et seq., create the Civil Aeronautics Board, herein referred to as the Federal Board and in said act called "the board," and provides for its organization, operation, and powers.

Section 1302 is as follows: "In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity: (a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense; (b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers, * * *."

Among the powers and duties of the Federal Board are those provided in the following sections. Section 1324(a) provides: "The Board is empowered to perform such acts, to conduct such investigations, to issue and amend

such orders, and to make and amend such general or special rules, regulations, and procedure, pursuant to and consistent with the provisions of this chapter, as it shall deem necessary to carry out the provisions of, and to exercise and perform its powers and duties under this chapter."

Section 1371, subsection (a), provides: "No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation."

Subsection (b) provides for the application for the certificate; and subsection (c) provides for the notice to be given before hearing, the setting of it for public hearing, and the disposal of the matter thereat.

Subsection (d) (1) provides as follows: "The Board shall issue a certificate authorizing the whole or any part of the transportation covered by the application, if it finds that the applicant is fit, willing, and able to perform such transportation properly, and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder, and that such transportation is required by the public convenience and necessity; otherwise such application shall be denied."

Subsection (e) provides in part that: "Each certificate issued under this section shall specify the terminal points and intermediate points, if any, between which the air carrier is authorized to engage in air transportation and the service to be rendered; and there shall be attached to the exercise of the privileges granted by the certificate, or amendment thereto, such reasonable terms, conditions, and limitations as the public interest may require."

Subsection (g), in part, is as follows: "The Board upon petition or complaint or upon its own initiative, after notice and hearings, may alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require, or may

revoke any such certificate, in whole or in part, for intentional failure to comply with any provision of this subchapter or any order, rule, or regulation issued hereunder or any term, condition, or limitation of such certificate: * * * Any interested person may file with the Board a protest or memorandum in support of or in opposition to the alteration, amendment, modification, suspension, or revocation of the certificate."

Subsection (j) is as follows: "No air carrier shall abandon any route, or port thereof, for which a certificate has been issued by the Board, unless, upon the application of such air carrier, after notice and hearing, the Board shall find such abandonment to be in the public interest. Any interested person may file with the Board a protest or memorandum of opposition to or in support of any such abandonment. The Board may, by regulations or otherwise, authorize such temporary suspension of service as may be in the public interest."

Section 1374 is as follows: "(a) It shall be the duty of every air carrier to provide and furnish interstate and overseas air transportation, as authorized by its certificate, upon reasonable request therefor and to provide reasonable through service in such air transportation in connection with other air carriers; to provide safe and adequate service, equipment, and facilities in connection with such transportation; to establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges, and just and reasonable classifications, rules, regulations, and practices relating to such air transportation; * * *."

Subsection (b) prohibits preferences to particular persons, ports, or localities.

Section 1375 provides for postal rules and regulations of each air carrier and the filing of the rates and schedules with the board and gives the Postmaster General certain powers to be exercised in the first instance and further provides: "No order of the Postmaster General under this subsection shall become effective until ten days

after its issuance. Any person who would be aggrieved by any such order of the Postmaster General under this subsection may, before the expiration of such ten-day period, apply to the Board, under such regulations as it may prescribe, for a review of such order. The Board may review, and, if the public convenience and necessity so require, amend, revise, suspend, or cancel such order; * * *. No air carrier shall transport mail in accordance with any schedule other than a schedule designated or ordered to be established under this subsection for the transportation of mail."

Section 1376 provides for establishing rates for the transportation of mail certain portions of which providing for the rate-making elements having been hitherto set out herein.

Section 1482 provides, in part, as follows: "(b) The Administrator or Board, with respect to matters within their respective jurisdictions, is empowered at any time to institute an investigation, on their own initiative, in any case and as to any matter or thing within their respective jurisdictions, concerning which complaint is authorized to be made to or before the Administrator or Board by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter. The administrator or the Board shall have the same power to proceed with any investigation instituted on their own motion as though it had been appealed to by complaint."

Section 1486 provides for judicial review from the rulings of the board to the courts of the United States therein named.

The Acts of Congress of 1958 and 1938 regulating air commerce are comparatively new and no cases are cited to us which directly decide the question before us as to the right of the states to require one engaged in air transportation to continue operations on a portion of its route after the Federal Board has suspended or de-

leted .service thereon. There are some decisions however that have been decided under those acts which throw light upon the question. Also there are decisions concerning those engaged in interstate commerce in different fields which appear in principle to be controlling herein.

Northwestern Airlines, Inc. v. Minnesota, 322 U. S. 292, 64 S. Ct. 950, 88 L. Ed. 1283, 153 A. L. R. 245, was a suit where the State of Minnesota recovered judgment against the Northwestern Airlines, Inc., for delinquent personal taxes on its personal property, including its airplanes situated in the state of its domicile. The United States Supreme Court upheld the power of the state to so tax the company's property and planes. The concurring opinion of Judge Jackson states: "Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government.

"Congress has not extended its protection and control to the field of taxation, although I take it no one denies that constitutionally it may do so. It may exact a single uniform federal tax on the property or the business to the exclusion of taxation by the states. It may subject the vehicles or other incidents to any type of state and local taxation, or it may declare them tax-free altogether. Our function is to determine what

rule governs in the absence of such legislative enactment."

The case of Braniff Airways, Inc. v. Nebraska State Board of Equalization & Assessment, 347 U. S. 590, 74 S. Ct. 757, 98 L. Ed. 967, was another case involving taxation in which Nebraska was permitted to tax the instrumentalities of Braniff used in interstate commerce on the apportionment basis in accordance with their use in the taxing state. The court in the cited case however clearly held that the federal statutes governing air commerce enacted under the commerce power did not preclude the challenged tax.

In United States v. United Aircraft Corp., 80 F. Supp. 52, a replevin suit was brought by the United States to recover possession of two aeroplane engines under a chattel mortgage recorded with the Department of Commerce, Civil Aeronautics Administration, against one to whom the engines had been delivered for repair after removal from the planes and who claimed an artificer's lien thereon. In that case the court held: "Congress, by the Civil Aeronautics Act of 1938, has pre-empted the field of conveyancing of interests in aircraft and portions thereof, to facilitate the control and promotion of air commerce. Civil Aeronautics Act of 1938, sections 1 et seq., 503(b), 49 U. S. C. A., sections 401 et seq., 523(b)."

"The pre-emption of the field of conveyancing of interests in aircraft and portions thereof to facilitate the control and promotion of air commerce is within the congressional power. Civil Aeronautics Act of 1938, §§ 1 et seq., 503(b), 49 U. S. C. A., §§ 401 et seq., 523(b)."

It is clear from these cases that in those matters in the field of aviation in which Congress has asserted jurisdiction, its acts are controlling and, in those particulars which its legislation does not cover, the states have certain residuary powers of legislation which do not contravene the Acts of Congress. This has hitherto been the rule in other fields of interstate commerce.

Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878, was a case brought by the State of Colorado against the United States to enjoin the enforcement of an order of the Interstate Commerce Commission. The commission had authorized abandonment of a line of railroad in Colorado doing business therein. The narrow gage line was not physically connected with other portions of the lines of the company owning it but it was operated in both intrastate and interstate commerce. The opinion states: "This railroad, like most others, was chartered to engage in both intrastate and interstate commerce. The same instrumentality serves both. The two services are inextricably intertwined. The extent and manner in which one is performed, necessarily affects the performance of the other. Efficient performance of either is dependent upon the efficient performance of the transportation system as a whole. * * * Because the same instrumentality serves both, Congress has power to assume not only some control but paramount control insofar as interstate commerce is involved. It may determine to what extent and in what manner intrastate service must be subordinated in order that interstate service may be adequately rendered. The power to make that determination inheres in the United States as an incident of its power over interstate commerce. The making of this determination involves an exercise of judgment upon the facts of the particular case. The authority to find the facts and to exercise thereon the judgment whether abandonment is consistent with public convenience and necessity, Congress conferred upon the Commission. * * * The sole test prescribed is that abandonment be consistent with public necessity and convenience. In determining whether it is, the Commission must have regard to the needs of both intrastate and interstate commerce." United States Feldspar Corp. v. United States, 38 F. 2d 91, involved a petition to review an Interstate Commerce Commission's order permitting the abandonment of a part of a railway which

engaged in both interstate and intrastate commerce though its physical system was located entirely within one state. In the cited case, Judge Hand's opinion contained the following remarks: "In such a case it can indeed make no difference whether it keeps on in intrastate commerce, if it has abandoned interstate commerce over all its right of way. Its losses or gains, in general its economic fate, cannot thereafter affect national transportation, however broadly viewed; it may be left to the authority of the state whose interest alone it can then affect. Such cases are rare. If, however, it remains an interstate carrier over any part of its right of way, its general economic integrity is of interest to the nation, and is for that reason within its protection. Such is the distinction between the two cases cited, as stated in the opinion of Mr. Justice Brandeis in Colorado v. United States. 'In the case at bar, the railway continued upon the remainder of its line to carry on interstate commerce. * * * It was therefore within the jurisdiction of the Commission to determine whether a part of the tracks should be abandoned not only for interstate, but for intrastate commerce; it need not leave it a parasite upon the national system of transportation, * * *.' "

Other cases apply the same rules with respect to regulations by the United States in other fields of interstate commerce. Illinois Gas Co. v. Public Service Co., 314 U. S. 498, 62 S. Ct. 384, 86 L. Ed. 371, so construes the powers of the Federal Power Commission with respect to pipelines under the Natural Gas Act of June 21, 1938. In State v. Western Union Tel. Co. (Ohio), 86 N. E. 2d 479, and in Western Union Telegraph Co. v. State, 207 Ga. 675, 63 S. E. 2d 878, the same holdings are made interpreting the Federal Communications Act of 1934.

The protestants rely greatly on the case of People v. Western Air Lines, Inc., 42 Cal. 2d 621, 268 P. 2d 723, a case where the Supreme Court of California held that the Congress had not assumed economic control

over air carriers to the extent of excluding all state regulation as to intrastate rates. The question of intrastate rates is not before this court but if the decision in that case was correct it does not necessarily follow that the states have jurisdiction to prevent such a carrier from eliminating its service over a route segment which has been ordered deleted from the carrier's federal certificate. The court in the cited case states: "No question is here presented or determined as to the effect of this provision upon state certification; and the requirement of federal certification does not necessarily preclude state control of intrastate rates."

This question of the effect of federal and state certification however is the precise one before this court in the present case and not the question of existence nor the extent of the power that may yet reside in the state authorities as to intrastate rates for air carriers.

The protestants cite many cases, some dealing with freight rates, or passenger fares in railroad cases, or the curtailment of local trains in intrastate service. They have little application to the case before us and will not be separately discussed. The federal statutes, 49 U. S. C. A., section 1, subsection (2), by its express terms, provides that the provisions of the Interstate Commerce Act governing railroads and pipeline carriers shall not apply "to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one state and not shipped to or from a foreign country from or to any place in the United States as aforesaid, except as otherwise provided in this chapter; * * *."

Other cases are cited with respect to regulations with regard to the use of local highways and vehicles thereon. The states retain quite broad police powers in such cases. They and others cited have no application to the case before us.

In consideration of the federal statutes discussed herein, it appears Congress has given the Federal Board

power to issue or withhold certificates of public convenience and necessity to air carriers engaged in air transportation, which is there defined as interstate commerce. 49 U. S. C. A., § 1371. It has provided by the same section that no air carrier shall engage in any air transportation unless such a certificate is in force. The certificate must specify the terminal and intermediate points which the air carrier is authorized to serve. The board has been given authority to alter, amend, modify, or suspend any such certificate in whole or in part upon petition, complaint, or on its own initiative, or to revoke the same. No air carrier shall abandon any route or part thereof except on application to this board to do so. The board may by regulations or otherwise authorize temporary suspension of the service.

The Congress has set out its general policy in 49 U. S. C. A., section 1302, and declared it to be the encouragement and development of foreign and domestic commerce, the postal service, and the national defense, all as therein set out. By other sections it has provided for an extensive mail subsidy that its purposes may be accomplished.

That Congress has adopted a general plan to regulate aviation in interstate commerce is apparent. If the Nebraska State Railway Commission under the guise of regulating intrastate commerce can require service to be continued on routes or segments of routes suspended or deleted by the Federal Board created by the Act of Congress to regulate such service every other state may do the same. Under those circumstances the general plan of regulation adopted by Congress would be wholly nullified. The subject is obviously national in character and uniformity of regulation throughout the nation is required. Congress has provided that uniformity and its will cannot be thus thwarted.

"The execution by Congress of its power to regulate interstate commerce is not limited by the fact that intra-

state transactions may have become so interwoven therewith that the effective control of interstate commerce by the Federal Congress incidentally controls intrastate commerce." Western Union Tel. Co. v. State, *supra*, citing many cases under this proposition.

It appears that Congress has pre-empted the field of interstate air transportation in regard to the routes and points to be served by interstate air carriers to the exclusion of conflicting regulation by the states. 49 U. S. C. A., §§ 1301(10), 1301(21), and 1371(a); Northwestern Airlines, Inc. v. Minnesota, *supra;* Colorado v. United States, *supra;* United Air Lines, Inc. v. Nebraska State Railway Commission, *supra;* In re Veterans Air Express, Inc., 76 F. Supp. 684.

It follows that the Nebraska State Railway Commission lacks authority to compel a carrier licensed by the Civil Aeronautics Board to continue operations over a segment which that board has authorized to be discontinued, since the federal authority is paramount in this area and the conflicting directive of the state's agency interferes with the national policy.

The commission had no authority in the matter and should have disclaimed jurisdiction.

Because thereof the order of the commission is reversed.

REVERSED.