**BUSBOOM GRAIN COMPANY, INC. and Fisher Farmers Grain & Coal Company, Petitioners,**

**and**

**Patrick W. Simmons, Illinois Legislative Director for United Transportation Union, Intervening Petitioner,**

**v.**

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**and**

**CSX Transportation, Inc., Intervening Respondent.**

No. 87–2228.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1988.

Decided Aug. 4, 1988.

---

Thomas F. McFarland, Jr., Belnap, Spencer, McFarland, Emrich & Herman, Chicago, Ill., Gordon P. MacDougall, Washington, D.C., for petitioners.

Dennis J. Starks, Office of the Gen. Counsel, I.C.C., John J. Powers, III, U.S. Dept. of Justice, Washington, D.C., for respondents.

Before WOOD, Jr., POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

Two shippers, Busboom and Fisher, joined by a representative of railroad workers, have challenged the Interstate Commerce Commission's decision to allow the Chessie system to abandon 17 miles of track in southern Illinois pursuant to 49 U.S.C. § 10903(a). We refused to stay the Commission's order, see 830 F.2d 74 (7th Cir.1987); the petitioners, in filing what amounted to a pro forma application for a stay, common in these abandonment cases, had inexplicably withheld their strongest grounds.

The track in question is the last three-quarters of the Brothers Branch line, which runs from the railroad's Evansville–Chicago trunk at Rossville four miles southwest to Henning, from Henning seven miles south to the well-named town of Collision, where Busboom has a grain elevator, and from Collision another seven miles south to Brothers, where Fisher, the other protesting shipper, has an elevator. Midway between Collision and Brothers a spur runs east three miles to an electrical generating plant owned by the Illinois Power Company. Once used to carry coal to the plant, the spur has not been in service for the last fifteen years. The track that the ICC authorized the railroad to abandon is the stretch of the Brothers Branch line running from Henning to Brothers, including the IPC spur.

The railroad made elaborate submissions to the Commission in an effort to show that continuing to serve Busboom and Fisher would impose costs vastly greater than its revenues from hauling corn and soybeans for these two shippers—the only business

of the Brothers Branch line. In the "base year" used by the Commission to determine the profitability of the Brothers Branch line the railroad had hauled fewer than 300 carloads, earning revenues of roughly $200,000 and losing—when all relevant costs are taken into account—more than $50,000. Much of the protesting shippers' challenge consists of efforts to show that the railroad has exaggerated the costs properly allocable to the Brothers Branch, and we begin with these efforts.

■ Some of them are futile, for example the complaint that the Commission improperly allowed the railroad to use "normalized" price data in estimating the value of freight cars used on the Brothers Branch line. (The estimate was used to compute the amount of depreciation that the railroad could figure into the costs of operating the line.) "Normalization" meant that the railroad, instead of using actual transaction prices for freight cars, used the manufacturer's cost of building the cars and added a mark-up for "normal" profit. It did all this because actual transaction prices might be depressed by a poor market in the year when the car was sold; yet the procedure seems not only roundabout but also misconceived. The relevant question in an abandonment case is what the railroad would save by abandoning the line, and the simplest way of estimating the freight-car component of this cost is to ask what the market value of the cars used on the line is, not what the cars cost to build. True, the cars' value to the Chessie system might be greater than their market value, for market value is value to the marginal purchaser, not to every purchaser; but market value is the place to start.

However, the pertinent regulation, whose validity these shippers do not question, allows the railroad to estimate the cost of freight cars "by first arriving at the current cost per car using . . . a price quote from the manufacturer," 49 C.F.R. § 1152.32(g)(3)(i) (1987), and it was within the Commission's discretion in interpreting its own regulation to allow the "normalized" method to be used in order to correct the distortions that would result from us-ing the purchase prices of cars bought when the market was depressed. See *International Minerals & Chemical Corp. v. ICC*, 656 F.2d 251, 256–57 (7th Cir.1981); cf. *Black v. ICC*, 737 F.2d 643, 656 (7th Cir.1984). The shippers were free to show if they could that the Commission's method yielded absurd results, as would be a reasonable inference if the normalized price turned out to be remote from both the market value of the cars and some reasonable estimate of their actual value to the Chessie system. But as they put in no evidence the Commission's estimate must stand. *Illinois v. ICC*, 722 F.2d 1341, 1349 (7th Cir.1983).

We were, nevertheless, pleased to learn at argument that the Commission was proposing to change its regulation so that henceforth a railroad will simply be asked what it would save in freight-car costs (by selling cars, or redeploying them elsewhere in its system) by abandoning a line. See *Abandonment Regulations, Costing: Implementation of the Railroad Accounting Principles Board Findings*, 53 Fed.Reg. 17,234 (1988). That is at once a simpler and an economically more sensible approach than normalization, but the approach followed in this case was within the Commission's discretion.

■ The shippers next, and seemingly inconsistently, complain that in computing fuel costs the Commission improperly confined its attention to the base year, which, as the shippers correctly point out, may not be representative of fuel costs over the entire period during which the Brothers Branch would remain in service if the railroad's request for abandonment were denied. The shippers want to make the same sort of adjustment that the railroad made in freight-car costs by using normalized rather than actual prices, but of course the inconsistency is equally the railroad's and the Commission's in refusing to normalize fuel costs. The Commission makes the curious argument that the well-known volatility of fuel prices supports the use of a single year; it supports the opposite. But again the shippers failed to carry their burden of producing evidence after the rail-

road has produced at least some evidence in its own favor.

We have affirmed the Commission's authority to allocate burdens of producing evidence between the proponents and the opponents of abandonment, see, e.g., *Simmons v. ICC*, 784 F.2d 242, 246 (7th Cir. 1985), while noting that the Commission's discretion in this regard is not plenary, see *Indiana Sugars, Inc. v. ICC*, 694 F.2d 1098, 1101–02 (7th Cir.1982); *Chesapeake & Ohio Ry. v. United States*, 704 F.2d 373, 379 (7th Cir.1983). There is on the one hand the strong interest in streamlining the abandonment process, an interest served by requiring protesting shippers to put up or shut up, rather than allowing them to spin out abandonment proceedings at no cost to themselves but great cost to the railroad by insisting that the railroad produce enough evidence to dispel any possible doubt that abandonment would be in the public interest. On the other hand, proceedings before the Interstate Commerce Commission are not supposed to be "purely adversary contests.... [T]he Commission is supposed to protect the public interest, not just umpire disputes. Shippers adversely affected only in the long run [by certain joint-rate cancellations proposed by Conrail] might not have the resources or the incentives to challenge Conrail's massive computer study, especially when that study was submitted in so summary a form as to discourage challenge." *Id.*

Here the Commission was entitled to conclude that the railroad had put in enough evidence on fuel costs to shift the burden of production to the shippers. This case is not like *Chesapeake & Ohio*, where the railroad was proposing massive operating changes bound to have extensive repercussions on the shipper community, and was complicating the task of opposition to its proposal by submitting an opaque summary of its undigestible statistical evidence. This case involves the proposed abandonment of a single, small, marginal line. In support of its proposal the railroad submitted 1,400 pages of reasonably lucid documentation. The protesting shippers were not entitled just to snipe. They could have

submitted futures prices for fuel; those would have been a better estimate of the relevant fuel costs over the predicted life of the Brothers Branch line (if not abandoned). They submitted nothing. Carping at the carrier's submission was not enough. See *Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246, 1250 (D.C.Cir.1988) (per curiam).

■ The shippers mount perfunctory attacks on two other aspects of the Commission's costing of the Brothers Branch line; we shall ignore these and move to the two most substantial such attacks. The first concerns the Commission's finding that the railroad would incur a $35,000 maintenance cost to keep the Brothers Branch line in service for one more year and $12,000 for each subsequent year. These expenses appear to be due to four recent bridge washouts. The cost of replacing the bridges the Commission quite properly treated as a capital expenditure to be depreciated, but it allowed other expenditures incidental to the washouts—in particular, expenditures on resurfacing the approaches to the bridges—to be treated as expenses in the year incurred: hence the $23,000 difference between the cost assigned to the first year and the cost assigned to the subsequent years. The rationale for this procedure is neither obvious nor explained. The resurfacing of the bridge approaches, like the building or buying of a new bridge, will yield benefits over more than one year unless (as we greatly doubt, and the record does not show) the approaches must be resurfaced yearly. The Commission offered no explanation for the discrepant treatment of these two items of cost. Its brief observes that the expenditures in question "were not normalized maintenance costs over the long run, but rather costs that would have to be incurred in the next year following the denial of the abandonment." But the same is true of the cost of replacing the bridges, and the Commission treated that cost differently. The Commission will have to make new findings on the matter.

And so with lumping in the IPC spur with the rest of the Brothers Branch line in determining the railroad's opportunity costs of continuing to operate the line. The shippers argue with great force that the spur is not an opportunity cost of operating the line. The spur could be abandoned—and summarily too, since it has had no business for the last fifteen years, see 49 C.F.R. § 1152.50(b); *Illinois Commerce Comm'n v. ICC, supra*—regardless of the fate of the rest of the line. Indeed, because the railroad had already removed much of the trackage on the spur, the Commission confined its estimate of net salvage value to the value of the land ($37,090). An opportunity cost is the revenue or other benefit forgone from using a resource in one way rather than another. By using freight cars to haul corn and soybeans from the Busboom or Fisher elevators, the Chessie system loses the income it would obtain from some other use of those cars, such as selling them, or leasing them to other railroads, or using them elsewhere in its system, where they might replace older cars or cars more costly to operate. That lost income is a true opportunity cost. The shippers argue, however, that without discontinuing its service to them, the railroad could readily, virtually costlessly, have abandoned the IPC spur—and perhaps even have found a buyer for the (remaining) track and land, thereby making the net cost of abandonment negative. (But how likely is that? If the railroad could make a net profit from abandoning the spur, why didn't it abandon it—which could have been done summarily—before this proceeding?) If they are right, the abandonment of the spur and the abandonment of the parts of the line serving the protesting shippers should be decoupled; the benefits that the railroad would obtain from abandoning the spur cannot be a cost of hauling corn and soybeans from Brothers and Collision if those benefits can be obtained without discontinuing that haulage. It is as if the railroad were arguing that an opportunity cost of the Brothers Branch line is the cost it is foregoing by operating another unprofitable line—in Florida. The Commission argues that until and unless the spur is abandoned the railroad might have to provide service over it if requested to do so. This suggestion cannot be taken seriously—no one wants service; and the tracks, or most of them, have been pulled up.

What complicates analysis, though, is the fact that the IPC spur may be so tiny that it cannot profitably be abandoned other than in conjunction with the rest of the Brothers Branch line. The legal costs alone, even of a summary and uncontested abandonment, might approach, or even equal or exceed, the salvage value of the spur. There are also the costs of putting the land in shape to be sold and of finding a buyer. And, most important, the land might be worth much more if sold as part of a larger unit—the entire Brothers Branch line—than if sold separately; and the difference is indeed an opportunity cost of continuing to operate the Brothers Branch line, for it is a cost that can be avoided only if the line is abandoned. But the Commission did not mention any of these factors. It said it was for the railroad to decide when to seek permission to abandon a given line. That is true, but irrelevant to whether the benefits of abandonment are an opportunity cost of an adjacent line (Brothers Branch). They are only if the benefits of abandonment cannot be obtained without abandoning the adjacent line as well. Maybe they can't be, but there is neither evidence nor finding on the question.

More may be at stake in this question than the spur itself. More than 80 percent of the revenues of the Brothers Branch line are earned on the segment that ends at Collision, where Busboom has its elevator. The seven-mile stretch from Collision to Brothers, where Fisher has its elevator, generates less than 20 percent of the business of the line. Had Busboom and Fisher not decided to stand together in opposition to the abandonment, Busboom might have been able to argue forcefully against including the costs of the last seven miles (along with the costs of the IPC spur). Those costs are not opportunity costs of continuing to serve Busboom but instead

are caused by the service to Fisher, which could be lopped off without affecting Busboom. The parties do not raise this issue, however, and it is a matter of judgment how finely the costs of continued service must be matched with particular shippers. The Commission could determine the costs and benefits of abandonment on a mile-by-mile, or for that matter inch-by-inch, basis, but certainly is not required to; the administrative costs would swamp the allocative gains.

■ Thus far we have been discussing the Commission's estimation of the benefits of abandonment (the cost savings to the railroad). But the most powerful challenge mounted by the shippers is to the Commission's estimation of—or rather to its refusal to estimate—the costs of abandonment to these two shippers, who will be forced to truck their corn and soybeans if the Brothers Branch line is abandoned. Busboom put in evidence that the substitution of truck for rail transportation would cost it an additional $69,000 a year. Fisher put in evidence that the substitution would cost it at least $6,000. The Commission summarized the shippers' evidence noncommittally, and a natural reading of the summary is that the Commission accepted that abandonment would cost these shippers at least $75,000. It then proceeded to finesse the evidence:

> The loss of rail service will not deprive [the shippers] of the ability to move their grain. The evidence shows that alternative service is readily available and that both [shippers] have used this alternative service. Their allegations concerning loss of markets as a result of the abandonment are not entirely convincing. While these shippers may experience some inconvenience and increased costs as a result of the abandonment, we have found in various proceedings that this is not sufficient to outweigh the detriment to the public interest of continued expiration of uneconomic or excess facilities. *Chicago & N.W. Transp. Co.–Aband.,* 354 I.C.C. 1, 7 (1977). This is particularly true where, as here, alternate transportation is shown to exist.

The discussion is entirely unsatisfactory. See *Illinois v. United States,* 666 F.2d 1066, 1080 (7th Cir.1981); cf. *Georgia Public Service Comm'n v. United States,* 704 F.2d 538, 543–46 (11th Cir.1983). Read naturally it says that increased costs to shippers are irrelevant—provided the costs are not infinite (which means, provided alternative transportation is available at any finite price)—if the service is uneconomical to the carrier. The *Chicago & N.W. Transp. Co.–Abandonment* case that the Commission cited does not support any such proposition; there the Commission had found that the protesting shipper would incur *no* additional cost as a result of abandonment.

The Commission can innovate; and we may assume without having to decide that the particular innovation of disregarding shippers' costs of alternative transportation entirely would be consistent with the Staggers Act. A shipper "may not ... insist upon the maintenance of a burdensome line solely for its own benefit; the conflict of interests so arising is precisely the kind of question which the Commission is set up to solve." *United States Feldspar Corp. v. United States,* 38 F.2d 91, 95 (S.D.N.Y.1930) (three-judge district court) (L. Hand, J.). If a shipper's cost of alternative transportation is greater than the cost to the carrier of continuing service, the parties should be able to negotiate a mutually beneficial contract to continue service but at a higher rate; the Staggers Act, consistent with the Act's deregulatory thrust (on which see, e.g., *Illinois v. ICC,* 709 F.2d 1186, 1193 (7th Cir.1983); *Illinois Commerce Comm'n v. ICC,* 749 F.2d 875, 877 (D.C.Cir.1984)), permits such contracts. See 49 U.S.C. § 10905; 49 C.F.R. §§ 1155.-1(c), 1152.27 (authorizing persons to offer subsidies to railroads to continue service that the railroad wants to abandon). So, for example, if it would cost these shippers $10 a ton more to ship by truck, and the Chessie system is losing (when all opportunity costs are reckoned in as losses) only $5 a ton on the Brothers Branch line, the shippers and the railroad would all be better off, compared with the alternative of abandonment, if the shippers offered and the railroad accepted a subsidy to the rail-

road of anywhere between $5.01 and $9.99 a ton. The absence of such an arrangement in this case signifies either that Busboom is exaggerating the cost of alternative transportation or that it is waiting to see what the outcome of the abandonment proceeding will be before sitting down to serious negotiations with the railroad.

So if the Commission had adopted a rule, whether by regulation or in common law fashion, refusing to consider shipper costs in deciding whether to permit the abandonment of an uneconomical service, the rule might well be within its power, although, as we have said, we need not and do not decide the question here. But the Commission has adopted no such rule; and unlike a court, an administrative agency is not allowed to change course without acknowledging what it is doing. It must acknowledge and give reasons for the change. See, e.g., *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983); *Illinois v. ICC, supra*, 722 F.2d at 1348. The ICC did not do that. Indeed, we are only speculating that it has changed policy. For all we know, it discounted the shippers' estimates of the cost of alternative transportation to the point where those estimates were smaller than the Commission's estimates of the benefits of abandonment. Or it may have made an arithmetical error. We are not at liberty to supply a rationale for the Commission's rulings; it must do that itself. *Id.; SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

The Commission's findings on first-year maintenance costs, the opportunity costs of the IPC spur, and the significance of the costs of alternative transportation to the shippers (particularly Busboom), are thus not adequately supported or explained. Yet, certainly when taken together, these findings appear to have been important to the Commission's decision. Particularly in view of the closeness (3–2) of the vote in the Commission to approve the abandonment of the Brothers Branch line, this is not a case in which we can overlook errors of commission or omission in the Commission's opinion, confident that the Commission would reach the same result on remand and unwilling to visit the costs of futile proceedings on the parties in an illusory quest for administrative perfection. See *Illinois v. ICC, supra*, 722 F.2d at 1348–49. In a close case the Commission's analytical mistakes cannot be dismissed as harmless.

REVERSED.